**HERCULES POWDER COMPANY**

v.

**UNITED STATES.**

Nos. 135-57, 152-58, 318-58.

United States Court of Claims.

Feb. 3, 1960.

David W. Richmond, Washington, D. C., for the plaintiff. Robert N. Miller and Frederick O. Graves, Washington, D. C., were on the briefs.

Garry A. Pearson, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for the defendant. James P. Garland and Lyle M. Turner, Washington, D. C., were on the briefs.

MADDEN, Judge, delivered the opinion of the court:

█ The plaintiff seeks to recover income taxes paid for the years 1948 through 1952. It paid the taxes as capital gains taxes upon the sale of shares of its own stock. It later concluded that the transactions were not taxable, and filed timely claims for refunds, which claims were denied.

The plaintiff is a Delaware corporation, whose stock is listed on the New York Stock Exchange. As of December 31, 1929, its capital structure consisted of 200,000 shares of preferred stock and 1,600,000 shares of no par value common stock. Only 114,241 shares of preferred and 598,000 shares of common stock were issued and outstanding.

On January 2, 1930, the plaintiff began purchasing shares of its own common stock, and continued to do so until September 21, 1932. The purchases were in lots ranging from 1 share to 1,600 shares, and amounted to 34,886 shares in all. The average price paid was $9.10 a share and the lowest price paid was in 1932 and was $3.47. Some 12,000 of the shares were purchased from the plaintiff's employees who had subscribed for the shares before the depression at $15 a share and did not wish to complete their purchases. The rest were bought through brokers on the open market.

During 1931 the plaintiff used 10,000 shares of the purchased stock, which we will call treasury stock, to buy the Paper Makers Chemical Corporation. During 1930, 1931, and 1932 the plaintiff sold 1,331 shares on the open market. In 1934, 800 shares were used to purchase the business of Universal By-Products Company. In 1937, and again in 1946, two for one split-ups were made in the plaintiff's stock. The figures used hereinafter with regard to the number of

shares are adjusted to make them represent original shares. Between 1933 and 1937 the plaintiff used 3,276 shares to pay bonuses to its employees.

After 1937 the plaintiff did not sell nor otherwise dispose of any of the remaining 19,479 shares, until 1948. On December 9, 1948, the plaintiff's board of directors voted a year end "B" bonus of $2,233,133 to certain of its employees who had been recommended by their superiors. Of the bonus, $1,750,038 was to be paid in cash, and the balance in treasury common stock at its then market value. The plaintiff's "B" bonus was a profit sharing device. Only once between 1930 and 1948, viz. in 1937, had any part of the "B" bonus been paid in common stock.

When the bonus stock was distributed to the employees, an accompanying letter from the president of the plaintiff said:

"We believe the key personnel who share in the bonus will appreciate this opportunity to increase their interest in the company and to participate as stockholders as well as employees in its continued growth and prosperity."

No restrictions were placed upon the employees as to the disposition of their bonus stock. A survey of 1,097 employees who received stock as bonuses in 1948 showed that only 49 of them had disposed of the stock during 1949.

The market value of the stock distributed as a bonus in December 1948, which was the value attributed to it in computing the amount of each employee's bonus, was greatly in excess of what the plaintiff had paid for the stock in 1930, 1931, and 1932. It is this excess which the Government asserts, and the plaintiff denies, was taxable income. Similar bonus distributions of treasury stock were made at the ends of the four succeeding years, and those distributions present the same legal questions as the 1948 distribution.

Section 22(a) of the Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.), § 22 (a), gives a broad definition of what is "gross income" for income tax purposes. It concludes with the words

"or gains or profits and income derived from any source whatever."

That is all that the statutes have to say about our principal problem. Obviously, some elaboration by some authority was required. Treasury Regulations 111 says:

"Sec. 29.22(a)–15. *Acquisition or disposition by a corporation of its own capital stock.*—Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances. The receipt by a corporation of the subscription price of shares of its capital stock upon their original issuance gives rise to neither taxable gain nor deductible loss, whether the subscription or issue price be in excess of, or less than, the par or stated value of such stock.

"But if a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. \* \* \* Any gain derived from such transactions is subject to tax, and any loss sustained is allowable as a deduction where permitted by the provisions of the Internal Revenue Code."

The foregoing regulation was applicable to all the years in question except 1952. Section 39.22(a)–15 of Regulations 118, applicable to the year 1952, is identical with its predecessor.

The problem of whether a corporation makes a profit, in a real sense, or in a tax sense, by dealing in its own shares, has been thoroughly discussed in the opinion of this court in the case of Anderson, Clayton & Co. v. United States, 122 F.Supp. 837, 129 Ct.Cl. 295, affirmed 350 U.S. 55, 76 S.Ct. 25, 100 L.Ed. 43.

This opinion will not attempt any comparable discussion. The following opinion of the accounting profession is of interest.

"Apparently there is general agreement that the difference between the purchase price and the stated value of a corporation's common stock purchased and retired should be reflected in capital surplus. Your committee believes that while the net asset value of the shares of common stock outstanding in the hands of the public may be increased or decreased by such purchase and retirement, such transactions relate to the capital of the corporation and do not give rise to corporate profits or losses. Your committee can see no essential difference between (a) the purchase and retirement of a corporation's own common stock and the subsequent issue of common shares, and (b) the purchase and resale of its own common stock. [Restatement and Revision of Accounting Research Bulletins, American Institute of Accountants, 1953, pp. 13–14.]"

The accountants, then, do not recognize the distinction made by the Treasury Regulations between the original issue of stock and the sale of treasury stock. It would, no doubt, be a crude attempt at over-simplification of an abstruse subject to suggest that when a corporation buys its own shares it is paying a debt, its obligation to the selling shareholder to pay him his proper share of dividends and the proceeds of liquidation, if that should occur. When it sells its shares it is creating a debt, the above-described obligation, to the new shareholder. Neither the payment nor the incurring of a debt results in a gain or a loss, except in unusual circumstances.

Financially, there would not seem to be one penny's difference between the consequences to the corporation of an original issue of 1,000 shares of stock for $100,000 and the sale of 1,000 shares of treasury stock for $100,000. An observer of the market, studying the situation of the plaintiff, would know that the corporation's shares had been diluted to the extent of 1,000 additional shares, in the one case as in the other. If the corporation bought in 1,000 of its shares, he would know that each of the remaining outstanding shares represented a larger fractional interest in the corporation's assets and profits. It would make no difference to him, in his estimate of the financial condition of the corporation, how the corporation kept its books. He would know that each one of these transactions represented a reconstruction of the capital of the corporation, because it represented a reduction or increase in the outstanding shares. Whether these sale and purchase transactions were rare or frequent, or large or small, would not change their essential nature as capital transactions.

The distinction drawn in the regulations, then, not recognized by the professional accountants, would seem also to be regarded as immaterial by the informed investor in the corporation's shares. But the regulations are not challenged by the plaintiff, and section 22(a) and the constitutional provision upon which it is based are couched in language broad enough to cover many kinds of transactions. It would seem, then, that the distinction made in the regulations was merely the reaction of the taxing authorities to the appearance of things, not giving perhaps undue regard to their analytical content. They looked at a corporation, real or imaginary, which was huckstering its shares in the same way that any speculator or investor would do with the shares of any corporation. It would appear to the unanalytical observer, who saw this corporation buy its shares low and sell them high that the corporation had made a profit. It looked as if it ought to be taxed, so the regulations taxed it.

The problem in a particular case would seem to be, then, how much does the activity of the corporation look like the activity of an outside investor and speculator in its stock. A slight resemblance would seem to be insufficient to justify the distinction.

In the instant case, the activities of the plaintiff in the 1930's might well have constituted taxable transactions within a fair interpretation of the regulations. The plaintiff bought a great many shares of its stock, sold some on the market, traded many for other properties, and used some to pay bonuses to its employees. Then for eleven years after 1937 it held the remaining stock in its treasury. Those were years in which one dealing in stock would normally have done some selling or buying. Then came the tax years here in question, and the dealing by the plaintiff with its stock. Those deals were of the special nature described above, the partial payment of year end bonuses to key employees. There would have been no point whatever in buying stock of another corporation to distribute as bonuses to the plaintiff's key employees. Giving them its own stock, and relying on their faith in the future of the company, or their inertia, to cause them to keep it, was a thoughtful and probably a wise procedure. It was not a dealing by the plaintiff in its own shares as it would have dealt in the shares of another corporation, and we conclude, did not result in a gain taxable under the regulations.

The plaintiff, in its tax returns for the years in question took deductions of the amount of the bonuses, including the market value of the stock, as compensation paid to employees. The Government, as an alternative defense, contends that if the plaintiff's "gains" are held to be exempt from taxation, the deductions were improper. It cites section 24 of the Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.), § 24, which reads as follows:

"§ 24. *Items not deductible.*

"(a) [as amended by Sec. 121(b), Revenue Act of 1942, c. 619, 56 Stat. 798] *General rule.* In computing net income no deduction shall in any case be allowed in respect of—* *

"(5) Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this chapter, or any amount otherwise allowable under section 23(a) (2) which is allocable to interest (whether or not any amount of such interest is received or accrued) wholly exempt from the taxes imposed by this chapter; * * * "

The plaintiff argues, and we agree, that the transactions here involved, once they are held not to be covered into taxability by the special provision in the regulations, must be regarded, not as producing income exempt from taxation, but as not producing income at all, exempt or otherwise. We think that the words "gives rise to neither taxable *gain* nor deductible *loss*" in the regulation concerning the original issue of shares did not create an exemption of income from taxation. That could not be accomplished by regulation. That language must mean that such an issue does not give rise to income, within the meaning of section 22.

The plaintiff is entitled to recover, with interest as provided by law, and judgments will be entered to that effec'. The amount of recovery will be de' mined pursuant to Rule 38(c), 28 U.C.

It is so ordered.

LITTLETON and LARAMORE, Judges, concur.

JONES, Chief Judge, dissenting, with whom REED, Justice (Retired), sitting by designation, joins.

The result reached by the court stems primarily from a belief that Treasury Regulation 111, § 29.22(a)–15, is not in accord with the economic facts of life or with the Internal Revenue Code of 1939, and consequently that a corporation does not make a gain or profit "in a real sense," or even "in a tax sense," when dealing with its own shares in the manner disclosed by the record in this case. Although the court has not direct-

ly invalidated the regulations, it would appear that it has accomplished the same result in its approach to the question of the plaintiff's tax liability. We would uphold the validity of the regulations. Clayton, Anderson & Co. v. United States, 1955, 350 U.S. 55, 76 S.Ct. 25, 100 L.Ed. 43.

The Government is not seeking to convert a strictly capital transaction into an income-producing transaction. If, as the plaintiff contends, the sale of treasury stock involves merely a "contribution to the capital of the corporation," it is difficult to understand why the Congress allowed the plaintiff corporation to deduct as a *business expense* the value of the treasury stock given to the employees in exchange for the alleged contribution to capital.

The majority, apparently, takes the position that a disposition of the corporation's shares for the purpose of implementing an employee profit sharing plan can never amount to a dealing in its own shares as it would in those of another corporation even when these shares were purchased in the open market. And it has decided the case on the basis of this single circumstance instead of determining the real nature of the transaction from all of its facts and circumstances, as the regulations require.

As we view the record in this case, the employee bonus plan was not essentially or primarily a plan for employee-stockholder participation. Rather it was based on the idea that the corporation should each year pay a part of its yearly profits to those employees who contributed most to the earning of those profits. The plan provided that the bonus could be paid in stock or partially in stock. There were no restrictions on the sale of the stock which the employees received. Therefore, we would hold that in accomplishing this primary purpose of the bonus plan—the payment of an immediate reward—the plaintiff dealt with its shares as it might in the shares of another corporation.

It is true, as the court has said, that "There would have been no point what-ever in buying stock of another corporation to distribute as bonuses to the plaintiff's key employees." This factor, however, seems irrelevant since the plaintiff could and did accomplish its purpose of rewarding its employees by making cash payments and by giving the employees stock which the corporation had purchased.

This particular stock had already been issued and 23,000 of the shares purchased were in the hands of individuals wholly outside the organization. It was purchased like any other asset. On its books it carried this stock like any other valuable asset, and in its income report for the years in question it properly treated this profit as capital gain. We cannot agree that this was an accounting error. If an individual employee or outsider had purchased this stock at the time the plaintiff purchased and had disposed of it in any fashion he would have been subject to a capital gains treatment.

Does anyone doubt that if the stock had gone down as much as it increased in value and plaintiff had used it as part payment of a bonus at the then current market value, it would have claimed a capital loss?

If the plaintiff had sold the stock in the open market and delivered the proceeds in order to pay all the declared bonus in cash, does anyone doubt that it would have been taxable?

The court in its opinion shows that the plaintiff used some of its stock to buy other companies. It sold 1,331 shares on the open market. When there was a split-up, the stock the company had bought participated. As we see it, this is exactly what would have happened if the Hercules Powder Company had been dealing in the stock of other corporations. Earnings, by dividends paid or by increased assets, on the treasury stock went to the company. The distribution at market value paid the company's obligation to its employees.

To permit the plaintiff to realize gains by purchasing stock at a low price and disposing of it in lieu of cash bonuses

at a higher figure, but escape all tax on the transaction, and at the same time take a deduction for salary paid to employees does not make sense. It will stand neither the light of reason nor the logic of analysis. The plaintiff's petitions should therefore be dismissed.

WHITAKER, Judge, took no part in the consideration and decision of these cases.