**PENN–TEXAS CORPORATION (Former-ly Colt's Manufacturing Company)**

v.

**The UNITED STATES.**

No. 299–58.

United States Court of Claims.

Oct. 3, 1962.

George D. Webster and Jules Levinson, Washington, D. C., for plaintiff; Davies, Richberg, Tydings, Landa & Duff, Washington, D. C., were on the briefs.

John F. Palmer, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R.

Miller, Washington, D. C., were on the brief.

DAVIS, Judge.

The Penn-Texas Corporation (formerly Colt's Manufacturing Company) sues for a refund of portions of the income taxes it was required to pay for 1951. There are two separate but related issues, both involving treasury stock acquired by the company prior to the taxable year. The first is whether the taxpayer realized taxable gain, in 1951, in exchanging 8,927 shares of the treasury stock at their appreciated value for property transferred to it. The second is whether in the computation of the taxpayer's excess profits credit for 1951, under the invested capital method, its treasury stock was includable in its total assets under Section 437 of the Internal Revenue Code of 1939, 26 U.S.C.A. Excess Profits Taxes, § 437 and as inadmissible assets under Section 440 of the 1939 Code, 26 U.S.C.A. Excess Profits Taxes § 440. The latter issue, with respect to the following year (1952), has recently been presented to and decided by the Court of Appeals for the Second Circuit in favor of the company. Colt's Manufacturing Co. v. Commissioner, C. A.2, 1962, 306 F.2d 929, No. 27250, (reversing the Tax Court, 35 T.C. 78 (1960)). The Second Circuit's opinion, which bears directly on the second issue before us, is also pertinent to the resolution of the first question.

Colt's,[1] the well-known arms-manufacturing concern, was a Connecticut corporation brought into being in 1855. In 1923 the General Assembly amended the charter to permit the company to purchase and hold a limited number of shares of its own stock "for the purpose of resale from time to time to employees." This power was broadened in 1947 to allow the sale or disposition of acquired treasury stock "at such times and to such persons, firms or corporations and in such manner as to the said board of directors may seem advisable." Under this authorization, Colt's reacquired, prior to December 31, 1949, 4,100 shares of its own stock in the open market, at a cost of $109,394. The purpose of this initial stock-purchase program was to resell the shares to the company's existing employees, as well as for possible distribution under stock options to new executives whom it hoped to enlist; but in fact the shares were never so used.

Another project for the purchase of treasury shares developed out of the company's extraordinary growth during World War II as a result of the increased arms purchases by the Federal Government. After the end of the heavy wartime sales in 1946, Colt's sought employment for its greatly expanded capital in other fields, but found no acceptable venture. Some stockholders, beginning in 1948, voiced dissatisfaction with the large amount of unused capital and solicited proxies for the election of independent directors who would be pledged to bring about a substantial distribution of superfluous assets; at the annual meeting in April 1949, three such dissidents were chosen for the eleven-man board. At the same time, the company's directors and officers were considering the possibility of making a distribution to stockholders which would not be taxable to them as ordinary income.

To attain the parallel ends of making such a distribution and also of buying out the minority directors, the board adopted the plan (in February 1950) of purchasing shares from stockholders at prices some $5 to $6 above the then market level (up to a total amount of $7,000,-000), and of holding these reacquired shares until disposition "in such manner and upon such terms as the Directors may deem advisable." The stockholders confirmed this plan in March 1950; and by May of that year 124,827 shares had been purchased (at a cost of $6,543,-

---

1. We shall refer to the taxpayer as Colt's, the name it bore during the period involved in this suit. Penn-Texas acquired Colt's in 1955, and in January 1956 a certificate of dissolution was filed for Colt's with Connecticut's Secretary of State.

780). The dissident stockholders were bought out and the minority directors ended all participation in the management of the company.

The total of 128,927 treasury shares thereafter possessed by Colt's remained dormant; the company had no specific plans for their use. They were not treated as an asset on the books but were classified as treasury stock and deducted from the issued stock in published financial reports. The company did not vote them, pay dividends on them, or use them as collateral for any loans. During this period, the treasury shares were not retired; that portion of the 200,000 issued shares which remained outstanding was regularly traded on the New York Curb Exchange (the American Stock Exchange); the company was authorized to issue 200,000 additional shares.

In May 1951, Colt's began negotiations with Walter P. Jacob Industries, Inc. for the acquisition of the latter's business and assets, including certain patents, license agreements, and equipment related to the manufacture of box-making machinery. The arrangement was consummated on July 18, 1951, and included the exchange of 8,927 shares of Colt's treasury stock for $564,632.75 worth of patents and license agreements belonging to Jacob (equivalent to $63.25 per share). Walter P. Jacob became the taxpayer's Executive Vice President.

The Jacob transaction left Colt's with 120,000 treasury shares. These were formally retired by a resolution of the board in December 1952, and a certificate of retirement filed with the Connecticut Secretary of State in January 1953.

The first question we have to answer arises because the Commissioner of Internal Revenue determined that Colt's made a long-term capital gain of $90,277.73 when it transferred the 8,927 treasury shares to the Jacob company in exchange for the acquisition of patent and license rights. The taxpayer insists that, in the circumstances shown by the record, the issuance of this treasury stock was not a taxable transaction under the Internal Revenue Code of 1939 and Regulations.

As the court recently pointed out in General Electric Company v. United States, No. 145–59, Ct.Cl., 1962, 299 F. 2d 942, the starting point for cases of this type governed by the 1939 Code [2] must be Section 29.22(a)–15 of Treasury Regulations 111 which basically provides that acquisition or disposition by a corporation of its own shares does not give rise to taxable gain or deductible loss unless the "corporation deals in its own shares as it might in the shares of another corporation," and that this standard must be applied to "the real nature of the transaction, which is to be ascertained from all the facts and circumstances." [3] This Regulation has been up-

2. This problem does not arise under the 1954 Code, Section 1032, 26 U.S.C.A. § 1032 of which excludes from gross income any gain or loss in an exchange of treasury stock for money or other property.

3. The pertinent text of the Regulation is as follows:

"Acquisition or disposition by a corporation of its own capital stock.

Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances. The receipt by a corporation of the subscription price of shares of its capital stock upon their original issuance gives rise to neither taxable gain nor deductible loss, whether the subscription or issue price be in excess of, or less than, the par or stated value of such stock.

"But if a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. So also if the corporation receives its own stock as consideration upon the sale of property by it, or in satisfaction of indebtedness to it, the gain or loss resulting is to be computed in the same manner as though the payment had been made in any other property. Any gain derived from such transactions is subject to tax, and any loss sustained is allowable as a de-

held, explicitly or impliedly, by the Supreme Court, five circuits, the Tax Court, and this court. See General Electric Co. v. United States, supra, slip op. at 7–8, 299 F.2d at 946. But the generality of its phrasing has inevitably led to difficulties in individual cases and the courts have found that they cannot avoid grappling directly with the particular circumstances before them.

The difficulties are compounded by the courts' rejection of all rules-of-thumb for characterizing treasury stock transactions as taxable or not. Failure to retire the shares does not require a result favoring the Commissioner of Internal Revenue (United States v. Anderson, Clayton & Co., 350 U.S. 55, 60, 76 S.Ct. 25, 100 L.Ed. 43 (1955), affirming 129 Ct.Cl. 295, 122 F.Supp. 837 (1954) [4]). On the other hand, the fact that the disputed transaction is single, unique, or nonrecurrent is not necessarily decisive for the taxpayer (Edwin L. Wiegand Co. v. United States, 104 Ct.Cl. 111, 60 F. Supp. 464 (1945)). Nor is speculative trading a prerequisite to taxability (Commissioner v. Air Reduction Co., 130 F.2d 145, 148 (C.A.2, 1942), cert. denied, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546). It is likewise not controlling, one way or the other, that the shares have no voting rights; that no dividends are paid on them; that the stock is or is not carried as an "asset" on the company's books; or that the taxpayer might conceivably have used authorized but unissued shares, instead of treasury stock, to reach the same objectives (Hercules Powder Co. v. United States, 149 Ct.Cl. 77, 180 F.Supp. 363; General Electric Co. v. United States, supra, No. 145–59, Ct. Cl., 1962, 299 F.2d 942). Similarly, it is not enough to assure taxability that, if the company had desired, cash could have been substituted for the stock, with the same general end-result; that would almost always be true and therefore cannot serve as the cardinal touchstone. None of these elements is conclusive in itself, but all may be important, together with other factors, in swinging the balance.

We are thus left to weigh all the "facts and circumstances" of Colt's exchange with Jacob on a scale calibrated only with this very general guide: Has the company "deal[t] in its own shares as it might in the shares of another corporation" (Treas.Reg. 111, § 29.22(a)– 15? Or, to put it another way, has it employed the treasury stock "as an ordinary asset as the stock of another corporation [or cash] would be" (Commissioner v. Air Reduction Co., supra, 130 F.2d at 148; see also Anderson, Clayton & Co. v. United States, 129 Ct.Cl. 295, 304–05, 122 F.Supp. 837, 843 (1954), aff'd, 350 U.S. 55, 76 S.Ct. 25, 100 L.Ed. 43 (1955))? Using that measure as best we can, we agree with the plaintiff that the transaction did not give rise to taxable gain. Colt's did not acquire its treasury stock as an ordinary asset or for investment and it did not hold or use the shares for those purposes; the exchange with Jacob was an adventitious use of treasury stock instead of unissued shares, on a particular occasion, to give the Jacob interests, which were then joining Colt's, a substantial stake in the company.

Of the taxpayer's treasury shares, 4,- 100 were purchased (in 1949) for the twin objectives of sale to Colt's employees and of possible distribution to new executives who might subsequently become affiliated with the company. In other circumstances such purposes could form an integral part of a company's plan to use treasury shares in discharge of its obligations, in place of cash, other stock, or other property (see General

---

duction where permitted by the provisions of the Internal Revenue Code."

The history of the Regulation is detailed in General Electric, supra, slip op., at 6–7, 299 F.2d at 945–46, as well as in Anderson, Clayton & Co. v. United States, 129 Ct.Cl. 295, 300–03, 122 F.Supp. 837,

840–42 (1954), aff'd, 350 U.S. 55, 76 S.Ct. 25, 100 L.Ed. 43 (1955).

4. Rejecting such cases as Commissioner v. Batten, Barton, Durstine & Osborn, Inc., 171 F.2d 474, 476 (C.A.2, 1948), and Commissioner v. Landers Corp., 210 F. 2d 188, 191–92 (C.A.6, 1954).

Electric Co. v. United States, supra). But in this case the company, unlike General Electric, had no such continuing program. The possibility of a sale of the shares was still inchoate and potential. Colt's was under no obligation to make stock available to its employees, existing or future, and in fact the 4,100 shares were never so used. There was thus no aim to use treasury shares to fulfill regular obligations to employees—as cash or other assets might be used—but rather the desire to accumulate stock for the "wholly intracorporate purpose" of possibly distributing stock in the future among key members of the organization, should that be thought desirable. See United States v. Anderson, Clayton & Co., supra, 350 U.S. at 59, 60, 76 S. Ct. 25, 100 L.Ed.43.[5]

In purchasing the remaining 124,827 shares of treasury stock in 1950, the company intended (a) to give its stockholders who wished to realize their share of the increased corporate assets the chance to receive their money free from ordinary income tax, and also (b) to eliminate stockholders and directors antagonistic to the management and to the majority of the board of directors. These two purposes are, of course, poles removed from treating the treasury shares as if they were stock in another company, or as an ordinary asset. For these aims, Colt's own shares were peculiarly required and peculiarly fitted. See Anderson, Clayton & Co. v. United States, supra, 129 Ct.Cl. at 302–03, 122 F.Supp. at 842. And the fact that Colt's reacquired over 60 percent of its issued and outstanding capital stock in this project emphasizes that this transaction was in the nature of an adjustment to its capital structure, and did not resemble the mere acquisition of an asset for use in the business.

The acquisitions of the treasury stock in 1949 and 1950 thus had their genesis in specific projects which do not suggest that Colt's was dealing in its shares in the manner prescribed by the Treasury Regulation for taxability. It might be said, however, that the taxpayer held the stock, once purchased, for broader objectives since the directors and stockholders had resolved (under the authorization of the amended charter) that the acquired shares could be held, sold, exchanged, transferred, or retired "from time to time, to such an extent, in such manner and upon such terms as the Directors may deem advisable." We do not regard this broad boiler-plate resolution as significant in view of our factual finding that in May 1950 Colt's had no specific plans to use the 124,827 shares then reacquired for any particular venture, plan, or purpose. The mere possibility that this block of stock could legally be used as an ordinary asset does not override the fact that in 1950 and 1951 it was not being so used and was not anticipated to be so used.[6]

We come, then, directly to the Jacob transaction in July 1951. The exchange of Colt's stock for the Jacob property was unrelated, as we have seen, to the purposes of the two acquisitions of stock in 1949 and 1950.[7] It was an isolated event, and formed no part of a general pattern of using treasury shares to purchase property or discharge obligations

---

5. Commissioner v. Air Reduction Co., supra, 130 F.2d at 146, 148 (C.A.2), held sales of treasury stock to corporate officers to be taxable, but there the sales were apparently made under an existing plan and pursuant to options previously granted. The company was therefore under a real obligation which it discharged by means of these sales. It is not clear, in any event, to what extent this portion of Air Reduction Co. has survived Anderson, Clayton. G.C.M. 16651, which the Second Circuit specifically noted as dealing with similar sales to corporate officers (130 F.2d at 148), has been revoked on the basis of Anderson, Clayton. See Rev.Rul. 60–328, 1960–2 Cum.Bull. 427.

6. In the context of the issue with which it was dealing, the Second Circuit agrees that the treasury stock was not acquired as an asset and not held as such. Colt's Manufacturing Co. v. Commissioner, supra, slip op. at 3041–3042.

7. The Second Circuit has reached the same conclusion in its Colt's Manufacturing Co. case, supra, slip op. at 3041.

in lieu of cash or other property.[8] It was never repeated, and the remaining shares were shortly retired in accordance with the original design of the directors and stockholders. Nevertheless, the Government argues, to give treasury stock in exchange for property is simply to substitute the shares for cash (or another marketable commodity) and therefore must necessarily be to deal with the shares as an ordinary asset. But we do not believe that every use of treasury shares to purchase property automatically falls into that class. If that were true, the specific limitation of the Treasury Regulation—that the firm must be dealing with its own shares "as it might in the shares of another"—would be inoperative for all such exchanges, regardless of the particular facts or "the real nature of the transaction." The Regulation expressly directs, however, that the individual circumstances and the true character of the transaction must not be overlooked.

Here, for instance, we have the unusual element that the original negotiations for the Jacob assets were in terms of a cash payment and the change to a partial-stock transaction was made at the suggestion and for the convenience of the Jacob interests, who apparently wished to acquire a proprietary connection with the company they were about to join. This uncommon factor, combined with the isolated character of the transaction and the absence of any plan on the part of Colt's to use treasury stock to make purchases or fulfill its obligations, confirms to us that the corporation was not treating its own shares like those of another company or as the equivalent of cash or some other normal asset. Rather, the treasury stock was used for the special end of tieing the Jacob people to Colt's—an intracorporate purpose which would not be satisfied by

cash or other property. See Anderson, Clayton & Co. v. United States, supra, 129 Ct.Cl. at 302–03, 122 F.Supp. at 842. The fact that treasury shares were used, instead of unissued stock, seems to have been due to nothing more than the coincidence that sufficient reacquired shares were lodged at that moment in the company's treasury.[9]

Our conclusion that the Jacob exchange did not lead to taxable gain is consistent, as we have already indicated, with General Electric Co. v. United States, supra, No. 145–59, Ct.Cl., 1962, 299 F.2d 942. Neither the acquisition nor the disposition of General Electric's treasury shares is comparable to the taxpayer's. General Electric received a large portion of its stock, on liquidation of its subsidiary, in return for the latter's stock held by the parent; this transaction was deemed covered by the part of the Treasury Regulation specifically providing that "if the corporation receives its own stock as consideration upon the sale of property by it" the gain or loss must be taken into account. The other major difference between the cases is that General Electric regularly used its own stock to satisfy recurring needs. The shares not received through liquidation were deliberately acquired in order to fulfill the obligations of the parent company and its affiliates under various employee compensation plans and for charitable contributions (which could have been satisfied in cash, at least partially)—and treasury shares were regularly disposed of for those purposes under what was in effect a continuing program. On these findings, the court concluded that General Electric "was engaged in the enterprise of acquiring [its own stock] for the purpose of using it in the discharge of its obligations, in lieu of the payment of them in cash or using other stock to discharge them"; and that

---

8. See Commissioner v. Air Reduction Co., supra, 130 F.2d at 146, 148 (C.A.2), in which the taxpayer had previously bought the same type of property making payment partly in cash and partly in treasury shares.

9. Colt's then president (Graham H. Anthony) testified that the treasury stock "was available, so we used it."

it actually and regularly used the shares so acquired in lieu of cash or stock in other corporations. That pattern and those circumstances do not exist in Colt's case.

The second issue is whether the treasury stock should be considered, in computing the taxpayer's excess profits credit for 1951 under the invested capital method, to be an asset within Section 437 of the 1939 Code (as well as an inadmissible asset under Section 440). Section 437(c) provided that the "equity capital of the taxpayer as of any time shall be the total of its assets held at such time in good faith for the purposes of the business, reduced by the total of its liabilities at such time." In passing upon this same question in connection with the tax for 1952, the Second Circuit has held that Colt's treasury stock was not an "asset" under this provision and was not held in good faith for the purposes of the business. Colt's Manufacturing Co. v. Commissioner, supra, No. 27250, C.A.2, 1962, 306 F.2d 929. We concur with those rulings.

None of the treasury shares, as we have shown in discussing the first issue, was acquired for investment or productive use or general purposes; and the great majority (124,827 out of 128,927) were not even acquired for a purpose directly connected with the carrying on of the business. There was no intention, at the inception of the purchase programs or thereafter, to use this block of stock as cash or other property would be used. And in fact the shares were not dealt with by the company as a business asset or as property; except for those transferred to the Jacob group, the stock was retired in 1952. The Jacob transaction, as we have noted, was isolated, unforeseen, and primarily motivated by the interests of the other party; even if those 8,927 shares could conceivably be viewed as assets under Section 437, the other 120,000 shares would still be unaffected.

Moreover, as the Second Circuit also suggested, the high proportion of treasury shares—128,927 out of a total of 200,000 issued (some 60%)—strongly indicates that this stock was not an asset but rather served, in substance, to reduce the company's equity capital. This result was officially recognized at the end of 1952 when the remaining 120,000 shares were formally retired. Although the accounting profession may not be wholly uniform in all of its views on the treatment of treasury shares, there appears to be agreement that a very large dormant segment of treasury shares, such as that held by Colt's in 1950 and 1951, should not be considered an asset.[10]

For these reasons, the plaintiff is entitled to recover on both issues, with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and DURFEE, LARAMORE and WHITAKER, Judges, concur.

10. Since the plaintiff must prevail if the treasury stock was not an asset held in good faith for the purposes of the business, within the meaning of Section 437, we need not decide whether the stock was also an inadmissible asset under Section 440.