**HERCULES POWDER COMPANY**

v.

**The UNITED STATES.**

**No. 251–61.**

United States Court of Claims.

Oct. 16, 1964.

---

David W. Richmond, Washington, D. C., for plaintiff. Frederick O. Graves, Clarence T. Kipps, Jr., and Miller & Chevalier, Washington, D. C., were on the briefs.

J. Mitchell Reese, Jr., Washington, D. C., with whom was Acting Asst. Atty. Gen., John B. Jones, Jr., for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

Before JONES, Senior Judge, WHITAKER, Senior Judge, and LARAMORE, DURFEE, and DAVIS, Judges.[1]

WHITAKER, Senior Judge, delivered the following opinion with which DURFEE, Judge, concurs, and announced the judgment of the court:

Plaintiff sues for the refund of income taxes for the taxable year 1953, for which defendant asserted plaintiff was liable on the ground that it dealt in its own shares of stock as it might have done in the shares of another corporation.

Section 39.22(a)–15 of Treasury Regulations 118, applicable to taxable year 1953, provides that "if a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed as though the corporation were dealing in the shares of another."

Plaintiff had purchased the shares, during the period January 2, 1930, to September 21, 1932, from its employees and on the open market. During the taxable year in question (1953), it distributed 6,571 of these shares to certain of its key employees pursuant to its stock

---

1. The trial of this case took place before Chief Judge Wilson Cowen when he was a Trial Commissioner of the court. As Trial Commissioner, Chief Judge Cowen rendered a report which the court has adopted as the basis for its findings of fact. However, Chief Judge Cowen did not take part in the consideration and decision of this case in any other respect.

bonus plan. Plaintiff's tax returns reported the difference between the adjusted basis for this stock and its market value, when distributed, as capital gains. Subsequently, however, plaintiff filed a claim for refund, alleging that it realized no income upon the transaction. The claim was denied, and this suit followed.

Except for the fact that another tax year is involved, the facts and issues presented by this suit are virtually identical with those presented to us in the case of Hercules Powder Co. v. United States, 180 F.Supp. 363, 149 Ct.Cl. 77 (1960). In that case we held that plaintiff was not dealing in its own shares as it might have dealt in the shares of another corporation and that it therefore realized no taxable income for the years 1948–1952 by distributing treasury stock under its bonus plan. In the earlier case, the Regulation applicable to the taxable year 1952 was also section 39.22(a)–15 of Treasury Regulations 118. Section 29.22(a)–15 of Treasury Regulations 111, which governed the years 1948–1951, contained identical language, insofar as this case is concerned, with section 39.22(a)–15.

Plaintiff says our earlier determination collaterally estops defendant from relitigating the question since the facts in the two cases are the same and there has been no change in the applicable law. We hold that defendant is estopped and, hence, we hold, as we did in the earlier case, that plaintiff is entitled to recover.

The landmark case on collateral estoppel is, of course, Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948). In that case the Court said that "matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel." 333 U.S. at 598, 68 S.Ct. at 719. While the Court held that this doctrine was applicable to tax as well as other litigation, it also said:

> "But collateral estoppel is a doctrine capable of being applied so as to avoid an undue disparity in the impact of income tax liability. A taxpayer may secure a judicial determination of a particular tax matter, a matter which may recur without substantial variation for some years thereafter. But a subsequent modification of the significant facts or a change or development in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes. If such a determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers of the same class. * * *

> "* * * [A] judicial declaration intervening between the two proceedings may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable. * * * *"

Id. at 599, 600, 68 S.Ct. at 720.

The Government says that the facts in the two cases are different and that there has been a change in the "legal atmosphere." First, is there a distinction between the facts in the two cases? The underlying events which gave rise to both controversies occurred prior to the first suit and are identical. The only variance in the facts in the two cases to which the defendant points is that the several corporate resolutions which implemented the bonus plan for the several years, of course, were not identical.

Plaintiff's bonus plan was first instituted in 1912. At that time, the plan provided that all bonuses would be payable in stock of the company. The plan was amended in 1934 to permit bonuses to be paid either in stock or cash or a combination of the two. Bonuses were paid from 1912 to 1929, when plaintiff began a stock subscription program that permitted employees to purchase its shares on the installment plan, with payments deducted from their salaries. From 1934 to 1936 plaintiff paid bonuses solely in cash because the exigencies of the De-

pression had increased the cash needs of its employees. In 1937 plaintiff resumed paying bonuses in both stock and cash. It did so thereafter, except in 1938, when no bonuses were paid, and during the war years, when all-cash payments were made to enable its personnel to buy Government bonds. After the war and during the years involved in these two suits, plaintiff paid the bonuses to its high-level executives and employees in treasury stock and cash. Cash payments were made to enable employees who received stock to pay the income tax imposed on their bonuses, so that they would not have to sell the stock in order to meet their tax liabilities.

During the tax years in question bonuses were paid in cash and stock. The sole difference was in the employees who received the bonuses and the amount of them. So far as the legal question posed is concerned, there is no difference in the facts.

As we have observed, plaintiff bought all the stock which it later distributed to its employees during the period of the Depression, from January 2, 1930, to September 21, 1932. The reason for the purchases was twofold—it bought about 12,000 shares from its employees who were unable to fulfill their commitments under its stock subscription plan, and it purchased approximately 23,000 shares on the open market, in order to support the price for its stock. The stock market debacle that took place at the onset of the Depression prevented plaintiff's stockholders, who wished to sell their stock to get much-needed cash, from finding buyers, and the disastrous possibility of a further drastic price drop prompted plaintiff to make selective purchases in order "to provide an orderly retreat in the market." [Finding 14.] Our commissioner's finding to this effect is supported by the evidence.

To provide means for carrying out its bonus plan was no part of plaintiff's purpose in purchasing this stock.

Plaintiff held this stock in its treasury and, after 1932, bought no more of it. Instead, plaintiff invested its cash surplus in the stock of other corporations and in Government bonds, which it sold when prices increased. In 1932 and 1934, plaintiff used some of its treasury stock to acquire control of two other businesses. Since 1934 it has distributed this stock only pursuant to its bonus plan.[2]

Defendant says that the fact that the 1953 corporate resolution authorizing the issuance of bonuses must, of necessity, have been a different act from the prior resolutions and the fact that the identity of the recipients as well as the particular amount of cash and stock each received were different, render the doctrine of collateral estoppel inapplicable, but defendant has failed to show what significance these new factual elements have on the solution of the legal problem before us. We think they have none. The factual differences must be material ones. They must have legal significance. The question before us is whether plaintiff was dealing in its own stock as it might have dealt in the stock of another corporation. We see no reason to change our determination of this question simply because plaintiff's resolution to carry out the bonus plan for 1953 named different recipients and allocated different amounts to each from the persons and amounts specified in the 1952 resolution and those that had gone before it. It is admitted that the class of persons benefited, i. e., key executives and employees, did not change as between the two periods of time. Nor were the purpose and effect of the bonus plan any different. Hence, we must reject defendant's contention that there is a significant factual distinction between the two cases.

Defendant does not assert that there has been a change in the statutes or the regulations, but it says that an intervening decision of this court has so altered the legal atmosphere as to require us to hold that it is not collaterally estopped.

2. During 1953, the year involved in this suit, plaintiff gave 6,571 shares, having a value of $446,828, together with $1,373,-787 in cash, to 1,240 employees.

The expression "legal atmosphere" is taken from the Supreme Court's opinion in the Sunnen case, supra. We suppose it meant by this expression a change in the judicial construction of the law as applied to the same or similar facts. The law applicable to this case is the regulation stating that gain is derived by a corporation from dealing in its own stock if it deals in it as it could in the stock of another corporation. That law has not changed, but, if, after the Hercules Powder decision, we had held in some other case, whose facts were materially the same as in Hercules, that the corporation had dealt in its stock as it would have in the stock of another corporation, then the "legal atmosphere" would have changed, and collateral estoppel should not apply, for all corporations should be treated the same. Defendant says General Electric Co. v. United States, 299 F.2d 942, 156 Ct.Cl. 617, cert. denied, 371 U.S. 940, 83 S.Ct. 319, 9 L.Ed. 275 (1962), is such a case. We do not agree.

In General Electric, we held that a corporate taxpayer that had acquired its own stock and had used it for the purpose, among other things, of giving bonuses to its employees pursuant to its bonus plan was dealing in such stock as it might have dealt in the stock of another corporation. The facts in General Electric were not the same as in Hercules Powder. General Electric acquired its supply of treasury stock, through open-market purchases and by the liquidation of a subsidiary, for the purpose of meeting its obligations under its bonus plan. Hercules Powder's stock acquisitions had no relation to its bonus plan. In addition, General Electric frequently used its treasury stock to defray obligations other than those arising under its bonus plan; it used the stock for charitable contributions and also issued it to its subsidiaries for their use in carrying out their own bonus plans. It carried the acquisitions of its own stock (more than 800,000 shares), which it had acquired over a period of 5 years, on its balance sheet under the heading of "investments" and

said, in a note, it "was held for corporate purposes."

All these facts led us to say:

"Under some circumstances, it is true, that a corporation's own stock held in its treasury is not an asset. Upon acquisition of it, absent an intention to use it as other property, the corporation's equity capital is reduced by the amount of it. But, where a corporation acquires it for the purpose of holding it temporarily and later using it as it might use the stock of another corporation, or as it might use cash, it would seem that it is of the same character as any other stock the corporation might acquire. In such case, the corporation's equity capital is not in fact reduced, because the treasury stock is earmarked for future disposition. It is somewhat in the same status as other outstanding stock while held in the treasury pending its disposition for a particular purpose, such as, e. g., for the purpose of discharging an obligation incurred or likely to be incurred."

299 F.2d at 947, 156 Ct.Cl. at 626.

We thought that all of the factual circumstances in General Electric distinguished that case from our earlier decision in Hercules Powder and that there was no conflict between the two cases. We did not overrule Hercules Powder but thought the facts of the two cases were so different as to require different conclusions.

In Penn-Texas Corp. v. United States, 308 F.2d 575, 158 Ct.Cl. 575 (1962), the question was the taxability of the gain alleged to have been derived from the exchange of 8,927 shares of treasury stock (acquired for resale to employees or such other persons as the board of directors might deem advisable) for the patents and license agreements of Walter P. Jacob Industries, Inc. We held the corporation had realized no taxable gain. In support of our decision we cited both General Electric and Hercules Powder, each as an authoritative application of the law to its peculiar facts.

In distinguishing Penn-Texas from General Electric, we said:

"Our conclusion that the Jacob exchange did not lead to taxable gain is consistent, as we have already indicated, with General Electric Co. v. United States, supra, No. 145–59, Ct.Cl., 1962, 299 F.2d 942. Neither the acquisition nor the disposition of General Electric's treasury shares is comparable to the taxpayer's. General Electric received a large portion of its stock, on liquidation of its subsidiary, in return for the latter's stock held by the parent; this transaction was deemed covered by the part of the Treasury Regulation specifically providing that 'if the corporation receives its own stock as consideration upon the sale of property by it' the gain or loss must be taken into account. The other major difference between the cases is that General Electric regularly used its own stock to satisfy recurring needs. The shares not received through liquidation were deliberately acquired in order to fulfill the obligations of the parent company and its affiliates under various employee compensation plans and for charitable contributions (which could have been satisfied in cash, at least partially)—and treasury shares were regularly disposed of for those purposes under what was in effect a continuing program. On these findings, the court concluded that General Electric 'was engaged in the enterprise of acquiring [its own stock] for the purpose of using it in the discharge of its obligations, in lieu of the payment of them in cash or using other stock to discharge them'; and that it actually and regularly used the shares so acquired in lieu of cash or stock in other corporations. That pattern and those circumstances do not exist in Colt's case." [158 Ct.Cl. 575, 585, 308 F.2d 580, 581.]

"That pattern and those circumstances" no more existed in Hercules' case than they did in Colt's. We are still of the opinion that the decisions in Hercules Powder and General Electric are not inconsistent and that the General Electric opinion did not change "the legal atmosphere."

It follows that defendant is collaterally estopped from relitigating this case, and that it was in error in imposing the tax that it collected from plaintiff. Plaintiff is entitled to recover.

Judgment will be entered in plaintiff's favor and the case is remanded for further proceedings pursuant to Rule 47(c) (2) to establish the amount of the refund to which plaintiff is entitled.

LARAMORE, Judge (concurring in the result):

I concur in the result reached by Judge Whitaker in his opinion, since I believe that, on the merits, this case is controlled by the first Hercules Powder case, supra. I adhere to my original belief that the General Electric case, supra, was erroneously decided.

DAVIS, Judge (dissenting):

I do not agree that defendant is barred by collateral estoppel from relitigating the issued decided in Hercules Powder Co. v. United States, 180 F.Supp. 363, 149 Ct.Cl. 77 (1960). This suit involves a different tax year. In such a case, the Supreme Court has told us, the doctrine of collateral estoppel is inapplicable if (a) "the relevant facts in the two cases are separable, *even though they be similar or identical*" (Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 601, 68 S.Ct. 715, 721 (1948), emphasis added); or (b) there has been "a change or development in the controlling legal principles" (id. at 599, 68 S.Ct. at 720), "a judicial declaration intervening between the two proceedings [which] may so change the legal atmosphere as to render the rule of collateral estoppel inapplicable" (id. at 600, 68 S.Ct. at 720), or "a sufficient change in the legal climate" to render the bar unavailable (id. at 606, 68 S.Ct. at 723). In my view, both of these alternatives are fulfilled here.

As Judge Whitaker's opinion points out, many of the relevant facts are precisely the same, not separable from, those in the earlier litigation. But that is not true of *all* of the facts, and Sunnen has confined collateral estoppel in tax cases to instances where "the very same facts *and no others* are involved in the second case" (id. at 601, 68 S.Ct. at 721, emphasis added). Moreover, I consider the annual resolutions to be a critical element in the continued execution of the bonus plan. Nothing could be done until the resolution for the particular year was adopted —or apart from the terms of that resolution. Even if the wording of the resolution for the taxable year was identical with those in the prior case,[3] the documents are, quite plainly, separate and distinct. Sunnen declares that, if "the second proceeding may involve an instrument or transaction identical with, but in a form separable from, the one dealt with in the first proceeding," then the "court is free in the second proceeding to make an independent examination of the legal matters at issue" (id. at 601, 68 S.Ct. at 721). This principle is illustrated by the holding in Sunnen itself. One tax issue concerned royalty payments growing out of license contracts which were identical in all important respect with an earlier contract which had been the subject of the first tax decision. The Supreme Court squarely held that "[f]or income tax purposes, what is decided as to one contract is not conclusive as to any other contract which is not then in issue, *however similar or identical it may be*" (id. at 602, 68 S.Ct. at 721, emphasis added).

There has also been, in my opinion, a "development in the controlling legal principles," "a change in the legal atmos-

phere" and the "legal climate." This standard does not mean that the earlier decision must have been overruled or limited strictly to its facts, or that the second ruling must necessarily be inconsistent with the first. The language used in the Sunnen opinion suggests, rather, that the second court should be freed from the prior determination if there has been some marked advance or alteration in relevant orientation, approach, reasoning or principles. Just such a change has occurred within this court, as a comparison of the opinion in Hercules Powder in 1960 with that in General Electric (and also in Penn-Texas) in 1962 will show.[4] It makes no difference that the decisions may all be reconcilable on their differing facts; for the application of collateral estoppel, the significant point is that the court's approach to this type of case has veered sharply since the first Hercules Powder. The way is therefore open for us to consider the issue, in the present context, on its merits.

On the merits I would hold for the defendant. Because of the intervening development, the former adjudication need not be followed, even as a precedent. See Mississippi River Fuel Corp. v. United States, Ct.Cl., 314 F.2d 953, 958, decided April 5, 1963 (concurring opinion). We can proceed *de novo*. This is not as clear a case for the Government as General Electric, but as I read the balance the needle does swing against taxpayer. Judge Jones' dissent in the earlier case is persuasive that the company dealt with the treasury stock, in and around the years of the bonus payments, as it could and would have dealt with another corporation's shares, or with

---

3. In fact, the resolutions are not identical, or nearly so. Compare finding 29 in the present case with finding 24 in the earlier one, 180 F.Supp. 363, 149 Ct.Cl. at 93–94.

4. For one thing, the Hercules Powder opinion cast doubt on the validity and theory of the Treasury Regulation. Both General Electric and Penn-Texas explicitly refer to and reaffirm its validity.

Another major difference is that Hercules Powder seems to consider the regulation's criterion of taxability as limited to a corporation "huckstering its shares in the same way that any speculator or investor would do with the shares of any corporation." 180 F.Supp. at 366, 149 Ct.Cl. at 82. Neither General Electric nor Penn-Texas takes that narrow a view of the regulation. See, also, n. 5, infra.

cash. That conclusion is underlined, for the present taxable year (1953), by the terms of the resolution implementing the bonus plan. The directors determined that "the portion of the bonus fund allocated to any individual may consist entirely of treasury stock, or entirely of cash, or partly of treasury stock and partly of cash, all in the discretion of the President" (finding 29). The equation, in the directors' minds, between cash and the treasury stock is thus made plain on the face of the resolution. So far as the policy-making board was concerned, the entire bonus could as well have been paid in cash. For the year 1953, this effectively nullifies, I think, the assumption that the purpose of the bonus, at least in part, was to give the recipients a stake in the corporation. I do not say that taxability results simply because the company, if it had desired, *could have* substituted cash for the stock. My point is that this company actually contemplated using cash and affrmatively decided that it was immaterial in which coin the bonus was paid. This is a controlling circumstance showing that the taxpayer, in fact, dealt in its own shares as it might in cash or the stock of another firm. See General Electric Co. v. United States, 299 F.2d 942, 948–949, 156 Ct.Cl. 617, 627–629 (1962), cert. denied, 371 U.S. 940, 83 S.Ct. 319, 9 L.Ed. 2d 275 (1962); Penn-Texas Corp. v. United States, 308 F.2d 575, 578–580, 158 Ct.Cl. 575, 581–585 (1962).[5]

JONES, Senior Judge, joins in the dissenting opinion.

---

5. In General Electric, a bonus payment case, the majority said that the facts of that case and of the first Hercules Powder "are closely alike"; the opinion specifies no differentiating facts or factors but contents itself with saying that "the facts of the instant case, we believe, bring it within the regulations" (299 F.2d at 949, 156 Ct.Cl. at 629).

Penn-Texas, in which the court decided against taxability, did not concern bonus payments but the isolated exchange of treasury stock for property owned by interests which were anxious to obtain a proprietary stake in the taxpayer-corporation. The facts are entirely different from those in the Hercules cases and there was, of course, no occasion to reconsider the first Hercules decision. But the Penn-Texas opinion clearly departs from the restricted approach of the *opinion* in the first Hercules. That decision is cited only for the accepted proposition that certain factors are not conclusive in and of themselves. In general rationale and approach, although one holds for the taxpayer and the other against, the Penn-Texas opinion is far closer to General Electric than to the earlier Hercules.