### UNION BAG–CAMP PAPER CORPORATION
v.
### The UNITED STATES.
### Nos. 147–64 to 150–64.

United States Court of Claims.
Oct. 14, 1966.

Arthur M. Becker, New York City, for plaintiff, John H. Alexander, New York City, attorney of record, William B. Landis, Joseph E. Bachelder III, and Nixon, Mudge, Rose, Guthrie & Alexander, New York City, of counsel.

Edward B. Greensfelder, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant, Lyle M. Turner and Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COWEN, Chief Judge.

Plaintiff deducted as ordinary and necessary business expenses (1) annual payments made by it under various leases for the exclusive use of timberlands, and (2) a portion of its expenses in managing these wooded tracts. The Internal Revenue Service disallowed the deductions, treating the yearly rentals as capital expenditures forming a part of the acquisition cost of timber and the management expenses as amounts allocable to the cost of timber sales:

Suing for the refund of taxes alleged to have been unlawfully assessed and collected, plaintiff invokes the principle of collateral estoppel and has moved for partial summary judgment on the basis of an earlier decision of this court involving the same parties. Except for the tax years in question, the facts of the instant case parallel those of our 1963 decision in Union Bag-Camp Paper Corp. v. United States, 325 F.2d 730, 163 Ct.Cl.

525, where we held that the annual payments in dispute constituted ordinary and necessary business expenses under section 23(a) (1) (A) of the 1939 Code.[1]

Since 1916, the plaintiff has been engaged in the manufacture of paper, paper bags, and related products. During the past 30 years, it has owned or leased timberlands for the purpose of supplying its manufacturing process with continuous crops of pulpwood.[2] In conjunction with this program, the plaintiff adopted extensive scientific methods for the management, conservation, and enhancement of the timber growth on such lands. Rather than depleting the forest by annual and excessive removal of timber, its "tree farming" technique has achieved a cyclical and recurring crop of timber for current and future use.[3]

Under most of the leases, the plaintiff agreed to refrain from cutting during the first 7 years in possession. Thereafter, removal of the trees was restricted to the annual growth of pulpwood-size timber.[4] Resultingly, the realty will be returned to the lessors with as much timber as existed thereon when the leases were executed.[5]

Plaintiff's timber rights were complemented by the acquisition, with minor exceptions, of the complete and exclusive use and control of the leased lands, including "all timber, logging, wood, turpentine and naval stores, oil, mining, mineral, water, water power, grazing, farming and hunting rights * * *"[6] In return the plaintiff was obligated to pay the lessor "as rental" an annual sum equivalent to 5 percent of an agreed and specified value of the leased lands. It also consented to satisfy all taxes levied upon the properties and to deposit annual amounts (5 to 10 cents per acre) into a forestry fund for fire protection and overall management of the timberlands.

It is our opinion that both the law and the facts compel adherence to the conclusion reached by us in 1963—namely, that the plaintiff became a party to a true lease and that its payments thereunder are deductible as ordinary and necessary business expenses. As noted in our earlier decision:

> Whatever words are used to describe the transaction in question, the inescapable fact remains that plaintiff's annual payments are made to acquire the exclusive use, possession, and enjoyment of the leased lands, including as a part of those possessory rights, the right to cultivate and cut the annual timber growth. * * * Looking at the forest instead of the trees, the only ultimate change contemplated for these timberlands is one of improvement to the timber stand, not depletion thereof.

1. Section 162(a) of the 1954 Code. Of the 23 leases in issue, only 10 were involved in the prior litigation. Plaintiff's motion is therefore confined to those 10 leases.
   For a more detailed presentation of the facts, see our earlier opinion, especially the findings of fact beginning at 163 Ct.Cl. 550 (1963).

2. For example, in 1949, plaintiff purchased approximately 85% of its pulpwood requirements from others and cut only about 15% from property it owned or leased.

3. At the time of the prior litigation, plaintiff had a Woodlands Division comprised of nearly 425 employees, of whom 90 were graduate foresters.

4. Payments to the lessors for the cutting of timber which exceeded the annual growth were reported by the plaintiff as the purchase price of the timber, and are not involved in this litigation.

5. Compare the following definition: "[D]epletion is based upon the concept of the exhaustion of a natural resource * * *" Mertens, Law of Federal Income Taxation, Vol. 4, § 24.02.

6. Plaintiff was also entitled to build and maintain roads, wells, mines and other structures on the land. The rights thus acquired were not financially inconsequential. In 1949, plaintiff realized income of $40,354.62 from miscellaneous uses of the properties (oil and mineral rentals, easements, turpentine leases, etc.). These factors further help to demonstrate that plaintiff did not, as contended by defendant, just purchase standing timber.

It follows that * * * [the] payments required to be made by plaintiff should be deemed to constitute "rentals or other payments required to be made as a condition to the * * * use or possession * * * of property" and should therefore be deductible from gross income in their entirety under section 23(a) (1) (A) of the 1939 Code [section 162(a) of the 1954 Code].[7]

The defendant challenges plaintiff's reliance on collateral estoppel by arguing that two recent decisions coming from the Fifth Circuit and the Supreme Court have effected a change or development in the controlling legal principles sufficient enough to lift the bar of collateral estoppel. With the defendant's contention as to the application of these two cases, Dyal v. United States, 342 F.2d 248 (5th Cir. 1965) and United States v. Catto, 384 U.S. 102, 86 S.Ct. 1311, 16 L.Ed.2d 398 (1966), we must express our disagreement.

In *Dyal,* our plaintiff's lessors sought capital gain treatment of the amounts received under the agreements now in issue. Attempting to negative the view that the sums were rentals which conferred exclusive use and enjoyment of the possessory rights attaching to the timberlands, they set forth the theory that a sale of the timber had been consummated between Union Bag and themselves. In opposition to this, the Government relied on our holding in the 1963 *Union Bag* case. While unwilling to grant blanket capital gain treatment, the Fifth Circuit held that the lessors could be afforded this tax advantage to the extent of the fair market value of the timber *"actually in existence* at the execution of the contracts." To this extent, *Dyal* is in disagreement with some of the reasoning in our 1963 decision, although not necessarily with our result.[8]

The Fifth Circuit justified its allocation formula in *Dyal* by reference to two revenue rulings issued in 1962. Rev.Rul. 62–81, 1962–1 Cum.Bull. 153; Rev.Rul. 62–82, 1962–1 Cum.Bull. 155. Admittedly, the contracts construed in these rulings contemplated, as here, the utilization of accepted forestry practices and the return of the leased properties with as much timber as was standing at the inception of the agreements. Each of them, however, contained factors which not only lend support to the conclusion reached in the rulings that a present sale of existing timber had occurred but which also render our facts readily distinguishable.

Whereas the contract payments in Revenue Ruling 62–81 were computed according to a fixed rate per cord, those involved here depend upon a specified value of the leased lands.[9] By the very terms of the contract in the ruling, the owner agreed to "sell" and the paper company to "buy" all the timber growing or to be grown on the tract.

The controlling factor, however, relates to the rights realized by the parties under their respective leases. Here, Union Bag acquired rights tantamount to the exclusive use and control of the timberlands, including mineral and mining rights, farming and hunting privileges, the right to sublease, to build and operate roads, and to grant easements. Of significance, too, is the fact that several portions of the property were devoid of trees at the time the leases were negotiated and that the plaintiff could not exercise its cutting rights for the first 7 years of each rental period.

Moreover, there is no indication that the lessees involved in the revenue rulings became vested with a legal interest as extensive as that gained by Union Bag. To the contrary, the landowner in Revenue Ruling 62–82 retained all min-

---

7. 325 F.2d 730, 739, 163 Ct.Cl. 525, 541–542 (1963).

8. See 342 F.2d 248, 254, footnote 13.

9. In Rev.Rul. 62–82, there was a lump sum payment.

eral rights and further agreed to reimburse the paper company for areas used by the landowner in its sand and gravel operations and for any damage to the timber resulting from such activities. And in Revenue Ruling 62–81, the rights which here form an integral part of the plaintiff's agreement are relegated to a residuary status: "Payments under the contract not attributable to timber existing at the execution of the contract are not proceeds of sale of timber by the landowner but are consideration for the use of the land by the paper company. * * * " 10

The distinction is this: Rights essential to the timber itself and the exchange thereof were of pivotal importance in both rulings; whereas, here, there is an agreement focusing upon the land and creating rights and obligations evidencing a lease in the true sense of the word. For these reasons, we stand by our earlier decision and disagree with the Fifth Circuit's sweeping application of Revenue Rulings 62–81 and 62–82.[11]

Lastly, the defendant urges that United States v. Catto, 384 U.S. 102, 103, 86 S.Ct. 1311, 1312, 16 L.Ed.2d 398 (1966), has sufficiently altered the relevant legal principles to preclude an application of collateral estoppel. In that case, the Supreme Court was called upon to decide:

> [W]hether taxpayers engaged in the livestock business who use an accrual method of accounting for animals raised for sale may employ a cash method of accounting for animals

raised for breeding purposes, in order to take advantage of a federal income tax benefit available to cash-method taxpayers when breeding animals are sold.

Answering this question in the negative, the Court held that the Commissioner had acted within the permissible scope of his discretion in denying the taxpayers' request to adopt the more advantageous method of accounting. A reading of *Catto* convinces us that its facts and legal problems are so alien to those before us that the decision can be summarily dismissed as inapplicable.

There being no significant change in the legal climate the doctrine of collateral estoppel is dispositive of the present litigation. Plaintiff's motion for partial summary judgment is therefore granted with respect to the leases involved in the prior litigation, and defendant's cross motion is denied. The case is returned to the trial commissioner for further proceedings, including a determination of the amount of refund due pursuant to Rule 47(c) (2).

### DAVIS, Judge (concurring):

I am unwilling to apply the bar of collateral estoppel, but instead would adhere on the merits to our ruling in 325 F.2d 730, 163 Ct.Cl. 525 (1963). There are two reasons, in my view, why it is inappropriate to invoke collateral estoppel. The first is the subsequent decision of the Fifth Circuit in Dyal v. United States, 342 F.2d 248 (1965), involving

---

10. 1962–1 Cum.Bull. 153, 155.

11. The Fifth Circuit felt that its decision was not incompatible with our 1963 holding that the payments by the lessee were deductible from gross income. Its conclusion in this respect was predicated upon § 1.631–2(e) of the Regulations which states that amounts paid by a lessee *"for timber or the acquisition of timber cutting rights,* whether designated as such or as rental * * * shall be treated as the cost of timber and constitute part of the lessee's depletable

basis of the timber, irrespective of the treatment accorded such payments in the hands of the lessor." (Emphasis added.) Utilization of this regulation, however, begs the question since it presupposes the rendition of payments for "timber or the acquisition of timber cutting rights." While this may have been the situation in the revenue rulings, it is our conclusion that the agreements here involved were more extensive and such as to render allocation logically unnecessary and realistically impractical.

the same lease-agreements and the same lands; that co-ordinate holding, sharply diverging in rationale from our 1963 decision, seems to me to have clouded the legal sky over this particular tax sector noticeably enough to dissolve estoppel. See CBN Corp. v. United States, Ct.Cl., 364 F.2d 393, decided July 15, 1966; Hercules Powder Co. v. United States, 337 F.2d 643, 647, 167 Ct.Cl. 639, 647 (1964) (dissenting opinion).[1] The second reason for not applying collateral estoppel is that many of the facts here, although parallel to those in the 1963 case, are separate from and not identical with the earlier circumstances. Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 601, 68 S.Ct. 715, 92 L.Ed. 898 (1948), tells us that in such a case the doctrine is not to be used. See Hercules Powder Co. v. United States, supra. For these reasons I would openly reach and dispose of the merits.

On that phase I agree with the court, since I am not persuaded that we erred in 1963. The Chief Judge's opinion points out that, in substance as well as in form, these were true *leases* of land, not merely sales or dispositions of timber. The taxpayer had the usual rights of leaseholders and actually enjoyed those privileges. See, e. g., footnote 6 of the court's opinion. Defendant does not deny that if these were indeed leases of land, rather than sales or conveyances of timber, the taxpayer would be entitled to deduct the amounts paid in effect as rent for the land. The major expenditures here fell into that category and, accordingly, were chargeable as ordinary and necessary expenses of the business. As the court says, the *Dyal* opinion should not be followed insofar as it suggests that these agreements were timber sales and not leases; the revenue rulings on which the Fifth Circuit relies are distinguishable, dealing as they do with other forms of agreement.[2]

---

1. As for United States v. Catto, 384 U.S. 102, 86 S.Ct. 1311, 16 L.Ed.2d 398 (1966), the livestock breeding decision, I agree with the court that it has no bearing upon either aspect of the present case.

2. On the deduction of the management expenses, the Government argues only that *Catto* implicitly disapproved our 1963 holding, but surely *Catto* cannot be stretched that far. See footnote 1, supra.