## O'BRIEN GEAR & MACHINE CO.

v.

## The UNITED STATES.

No. 105–72.

United States Court of Claims.

Jan. 24, 1979.

David Davidson, Chicago, Ill., attorney of record, for plaintiff. Davidson & Schwartz, Chicago, Ill., of counsel.

Thomas W. Petersen, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before NICHOLS, KASHIWA and SMITH, Judges.

### OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge David Schwartz, filed August 16, 1977, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the said decision as the basis for its judgment in this case. Accordingly, the court concludes and specifically finds that defendant's special plea in fraud is sustained and plaintiff's claim is adjudged forfeited to the United States pursuant to 28 U.S.C. § 2514. The petition is dismissed and judgment of forfeiture is entered on defendant's second counterclaim.

### OPINION OF TRIAL JUDGE

SCHWARTZ, Trial Judge:

In this suit for redetermination of profits under the Renegotiation Act of 1951, 50 U.S.C.App. § 1211 *et seq.*, as amended, the plaintiff maintains, as is customary, that its profits for the year under review were not excessive. The suit differs from most such suits, however, in that the primary issue concerns the honesty of the records present-

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report, filed August 16, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

ed by the plaintiff, on the pretrial and trial of the case, as proof of its profits.

The Government's main defense is a contention that plaintiff's proof as to its costs and profits, in its books and records and in its income tax return for the year under review, is false and fraudulent, and it having been knowingly presented in the attempted proof of the claim, the claim should be forfeited under 28 U.S.C. § 2514 (1970).[1] The defense is upheld, and the claim is forfeited. On the facts found in reaching the judgment of forfeiture, it is alternatively held that plaintiff has failed to make the prima facie case as to its costs and profits, required of it under *Lykes Bros. S.S. Co. v. United States,* 459 F.2d 1393, 1401, 198 Ct.Cl. 312, 326–27 (1972). In the event of a judgment of forfeiture, the Government has waived its counterclaim alleging excessive profits to an amount greater than determined by the Renegotiation Board. The waiver makes it unnecessary to consider the degree to which the production by the plaintiff of defective war material, shown by the record, constituted such an affirmative harm to the war effort as would affect the excessiveness of plaintiff's profits in the year under review, within the meaning and policy of the Renegotiation Act.

The plaintiff corporation, located in Highland Park, Illinois, is a manufacturer and supplier of gears and machine parts, most of which are sold to the Government for varied military uses. Raw materials, usually metals and alloys available in the commercial market, are obtained from a few regular suppliers, cut and machined in plaintiff's own shop as necessary, and then packaged for shipment. Special heat processing, where called for, is done by an outside plant.

Substantially all of the stock in plaintiff is owned by George C. O'Brien, plaintiff's founder and president, who supervises oper-

ations in the machine shop and does all the bidding. Company personnel consists of a controller; a treasurer, who was Mr. O'Brien's elderly mother; an office manager; a few clerical employees; and an average of 40 production employees. In plaintiff's fiscal year ending September 30, 1967, the year under review, plaintiff reported total sales of $1,966,845, of which $1,745,389 or 89 percent was renegotiable. Reported profits on the renegotiable sales were $203,-534, a rate of 11.7 percent. Renegotiable profits as reconstructed in the findings of fact made after trial, to the extent plaintiff's books permitted reconstruction, were $363,770.

The plaintiff had in 1970 been convicted in the U. S. District Court for the Northern District of Illinois on a number of counts of conspiracy with its president, Mr. O'Brien and with unnamed others to violate 18 U.S.C. §§ 286 and 287 in connection with Government contracts and other matters. The conspirators had between 1965 and 1968, among other things, submitted false claims against the United States in violation of 18 U.S.C. §§ 286 and 287 for payment of goods delivered under contracts for use in ships, airplanes, gun mounts and radar installations, with knowledge that the goods did not conform to the specifications and were inferior to those required; had willfully possessed and made false certificates of the testing of such goods; and in violation of 18 U.S.C. § 1503 had obstructed justice by removing from the plaintiff's files and willfully refusing to produce documents as commanded by a grand jury subpoena duces tecum.

Plaintiff's office manager and corporate secretary during the relevant period was one Julian M. Davis, who was employed throughout 1967 and until February 1968. His duties included supervision of accounts receivable and bank accounts. Davis was indicted with the plaintiff but was not tried.

---

1. 28 U.S.C. § 2514 (1970):

"A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

"In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture."

On the trial of the present case, Davis testified that during 1967 Howard Williams, plaintiff's controller, using charcoal pencil, made out a number of checks to cash, and that he, Davis, cashed them, endorsing them in similar pencil. Davis would then either hand the cash to O'Brien or put it in his desk drawer. On the return of the check by the bank, following its payment, Williams would erase the pencilled name of the endorser and the word "cash," type in as payee the name of one of plaintiff's supplier companies, and stamp an endorsement in the name of that supplier, using a counterfeit rubber stamp. Corresponding entries would then be made in plaintiff's check register. Davis testified that the bogus stamps had been procured by Williams, using as models the rubber stamp on other, legitimate checks. Williams had prepared many such endorsement stamps but the only one that the witness could remember specifically was that for the Central Steel & Wire Company.

To substantiate these pretended payments, Davis continued, Williams caused to be printed a number of invoices in the names of plaintiff's suppliers, the pretended payees. Williams would type up such blank invoices to match the amount of the check, to give the appearance of actual purchases corresponding to the amount of the checks.

Davis testified that O'Brien, the plaintiff's president, procured a number of blank forms for the test certificates required by the "fast pay" procedure used in small purchases by the Defense Supply Agency, one of plaintiff's two Government customers. These O'Brien delivered to Davis to put in the company's vault. Certificates were filled out by Davis in the name of three or four of plaintiff's suppliers, one of them Central Steel & Wire Company. Davis would prepare the certificate, using information from the plaintiff's purchasing records, to give the false appearance that the supplier companies had actually tested the items.

In the time between the making and delivery of the bid and the award of a Government contract, Davis further testified, he modified bids to change their amount. These modifications were connected with what O'Brien called "pay offs" to Government buyers at the Electronics Supply Office of the Navy at Great Lakes, Illinois, the other of plaintiff's two Government customers. O'Brien would ask him to compute the difference between the original and the altered bid amounts, in order to determine the "commission" to these buyers.

Finally, Davis testified that sometime late in 1966 he was given a check for $10,000, ostensibly as a bonus, but that the auditing firm in charge of plaintiff's books directed him to cash the check, to declare the $10,000 as income and pay the tax thereon—about $2,500—and to return the remainder to O'Brien. Plaintiff then recorded the $10,000 payment on its books as a bonus and declared it as an expense in its income tax return for either its fiscal year 1966 or 1967. Plaintiff's tax returns for both these years were introduced by it into evidence.

Davis' testimony was substantially a repetition of a statement he made to the authorities shortly after his indictment. His testimony on trial was given with every appearance of truth and is found to be credible and reliable.

The state of plaintiff's books and records was testified to by Mr. Ronald Cooper, an accountant with the FBI, in charge of the examination of the books and records submitted by plaintiff, in the pretrial of the present proceeding, for audit by the defendant. He testified to the confusion in plaintiff's books, which included unsupported entries, inconsistencies between tax forms and record entries and between checks and check registers. Numerous items in plaintiff's cash and bank accounts had no supporting documentation and lacked any indication of source, destination or vehicle of disbursement. In his opinion, plaintiff's books were not kept in accordance with generally accepted accounting principles. Mr. Cooper testified to the following specific matters.

He examined the check register for plaintiff's fiscal year 1967, with particular reference to an earlier Internal Revenue Service disallowance of $144,234 claimed on plaintiff's return for 1967 as a deduction on account of cost of goods sold. The $144,234 represented the sum of 31 checks described in plaintiff's check register as payments to suppliers. The cancelled checks themselves were missing from plaintiff's records, but a few of them were traced from bank microfilm records. The microfilms showed these checks to have been made out to cash and endorsed by Julian Davis, and were presumably actually treated in the manner described by the witness Davis.

Six amounts to a total of $59,000 were in 1967 posted in plaintiff's ledger to research and development, shown in the check register to have been made out to suppliers and in fact, as the bank microfilms showed, were made out to cash and cashed over the counter at the plaintiff's bank. These checks are presumed to have been part of the 31 checks for $144,234 discussed above. Plaintiff's general ledger for 1967 contained no postings of year-end closing adjusting entries to account for the remainder of the $144,234 in missing checks. Mr. Cooper concluded that the claimed deduction of $144,234 was not a proper business expense, since it was unsupported by any documentation other than a general attribution in part to "research and development," and consisted at least in part of checks actually made out to "cash." It appears that the $144,234 was a false deduction from income.

Mr. Cooper examined not only plaintiff's records for 1967 but also plaintiff's general ledger from 1964 to 1968, a general journal from 1959 to 1968, and records of cash disbursements, cash receipts and sales between 1962 and 1968. Plaintiff's profits for years other than 1967 are not directly in question in this suit. These records, however, were submitted for review by plaintiff in the pretrial of this case and they are relevant if not on the plea of attempted fraud in proof of 1967 profits then in the evaluation of the trustworthiness and thus the probative value of plaintiff's records in general.

With minor exceptions, no supporting documentation was provided for the entries contained in these books. The only available trial balance papers, which normally contain closing adjusting entries, related to the fiscal year 1966.

A $150,000 deduction from income in 1968 comprised four separate entries purporting to be cash disbursements by check. The checks themselves were missing. In plaintiff's bank statements, Mr. Cooper found references to 24 checks, to a total of $150,000, which were not recorded in plaintiff's books. Although there was a posting reference to the checks, there was no corresponding listing in the general ledger, general journal or records of receipts and sales. Again, microfilms of the actual checks as they cleared the bank showed that they had been signed by Mr. O'Brien, made out to "cash," and were negotiated either by Mr. O'Brien or by plaintiff's controller, Howard Williams. The net result was that the $150,000 was not an expense but rather income not disclosed in the tax return for 1968.

Asked about the checks with replaced payees and endorsements and the other accounting discrepancies in plaintiff's books, Mr. O'Brien denied all knowledge of financial transactions. He specifically denied any knowledge of the checks making up the $150,000 disbursement and deduction in 1968. He could not remember having ever seen such checks. Presented with the checks, he acknowledged that his signature appeared as maker and endorser. He knew nothing of the income tax returns; they had been prepared, he said, by Howard Williams, the company's controller, who took care of the books and conducted all the company's financial affairs and he had signed them as plaintiff's president. Though he owned 96 percent of the stock in plaintiff, he denied control over his own salary as president. That salary, he said, was set by the controller, "whoever he was," that is, Williams.

Further, Mr. O'Brien denied having anything to do with the forged test certificates

which Davis had testified were procured by O'Brien. One of the acts in furtherance of the conspiracy between plaintiff and Mr. O'Brien to violate 18 U.S.C. § 286 was that in 1965, he, O'Brien, had placed an order with a printing firm in Evanston, Illinois, for 5,000 copies of a certificate of test form of the Central Steel & Wire Company. Another was that on August 18, 1967, in the year under review in violation of 18 U.S.C. § 1002, he knowingly and with intent to defraud the United States had possession of 3,000 false, forged and counterfeited Certificate of Test forms purporting to be forms of Central Steel & Wire Company, with the signature "J. Adams" appearing thereon. O'Brien was the sole witness for the plaintiff.

In pursuance of the Government's investigations of the plaintiff, the Defense Industrial Supply Center of the Defense Supply Agency at Philadelphia, the other of the plaintiff's two major Government customers, organized a task force led by a quality assurance specialist to make tests on the goods supplied by plaintiff, to the extent they were still in stock and could be located, under 180 randomly selected contracts. Items not in conformity with specifications were found to have been supplied in 109 of these contracts; 37 of the 109 had been awarded and entirely performed in 1967; 34 had been awarded prior to the year under review and partly performed in 1967.

The nature of the nonconformities varied. Where specifications called for one metal, another metal was used; alloys were used which were inferior to those required. Electrical rings supposed to be made of silver were in fact made of plated copper; cold rolled steel was used instead of stainless steel. Where a part was to be made of aluminum, a plastic was used. Where a hard chrome finish was required, it was not supplied. Where heat treatment was specified, it was omitted. Where tolerances or dimensions or qualities were specified, the actual tolerances were unacceptably different. For instance, studs required to have a tensile strength of 125,000 psi in fact had a tensile strength of 65,000 psi. At least 14 counts of the conviction of plaintiff in 1970 concern such deliveries under contracts performed by plaintiff in the fiscal year 1967. The goods themselves had been destroyed, but the conviction and the abundant expert testimony on the deficiencies in the goods are convincing evidence.

Most of the contracts with the Center were for small amounts, for under $2,500 (and, plaintiff points out, their total amounted to only about 4 percent of plaintiff's renegotiable sales). The items sold would go directly to military-user facilities which have no facilities for testing for compliance with the specifications. Such contracts provided for a "fast payment" procedure under which the supplier received payment promptly upon submission of an invoice containing a certification that the supplies shipped were as specified in the purchase order. O'Brien had signed certificates of compliance with specifications in virtually all of the 71 contracts found to be noncomplying during 1967. The Government, not planning to make further tests, of course relied upon these certifications, and upon the supporting certificates of testing.

I

### The Question of Forfeiture of the Claim Under 28 U.S.C. § 2514

The Government's first defense is that the claim is forfeit under 28 U.S.C. § 2514, which provides for the forfeiture of a "claim against the United States" for "any fraud against the United States in the proof, statement, establishment, or allowance thereof." Note 1, *supra*. The plaintiff's response is a denial of fraud, with apparent reliance on Mr. O'Brien's denials, and a contention that plaintiff's petition for redetermination of the excessiveness of its profits is under section 108 of the Renegotiation Act, 50 U.S.C.App. § 1218, and the decision of this court in *Lykes Bros. S.S. Co. v. United States, supra*, not a claim against the United States but rather a claim by the Government for the amount of the alleged excessive profits.

## A. The Fraud

The first question—as to the facts of fraud in the sense of section 2514—is readily disposed of. The fraud is only too plain.

■ The former conviction is by collateral estoppel binding on the plaintiff in this court. *Commissioner v. Sunnen*, 333 U.S. 591, 597–98, 68 S.Ct. 715, 92 L.Ed. 898 (1948); *Armstrong v. United States*, 354 F.2d 274, 289–91, 173 Ct.Cl. 944, 968–72 (1965); *Hercules Powder Co. v. United States*, 337 F.2d 643, 644, 167 Ct.Cl. 639, 641–42 (1964); *cf. Kowal v. United States*, 412 F.2d 867, 870, 188 Ct.Cl. 631, 636–67 (1969). The totality of the evidence, of which the former conviction is only a part, shows abundantly that false and fraudulent entries were made and entered in books and records of the plaintiff which were submitted by plaintiff for examination in the pretrial of this case, and in its income tax returns and its submissions to the Renegotiation Board, introduced by plaintiff in evidence on the trial of this case. The checks on which payees' and endorser's names were erased and forged are clear and convincing evidence of false entries of costs, as part of a continuing plan to understate the profits of the corporation, to the personal profit of plaintiff's president O'Brien and perhaps others.

The frauds explicitly proven, moreover, are not necessarily all those that occurred, for plaintiff was convicted of withholding papers in its records, in disobedience to a subpoena.

The object of the frauds was to deceive the Internal Revenue Service as to the amount of plaintiff's taxable income and to deceive the Renegotiation Board as to the reasonableness of plaintiff's profits. When these records, shot through with fraud, were presented by plaintiff in support of its case in this court, a further, specific object was added—the proof by fraud of the claim here made. The fraud practiced here was an attempt by false and fraudulent records to prove that plaintiff's profits were lower than they actually were, and thereby to obtain a favorable determination that plaintiff's profits were reasonable and not excessive.

■ Mr. O'Brien's testimony, denying all knowledge or responsibility, is rejected as in itself unconvincing and in the face of the contrary evidence incredible. The testimony was self-contradictory, impeached on cross-examination, and overwhelmed by the credible written evidence and witnesses for the Government, which assumed and met the burden of proof on the issue. Mr. O'Brien's demeanor on the stand and his testimony, delivered in a listless monotone, are indescribable except to say that they engendered total disbelief. He is held to have organized and directed the original fraud and the effort here to prove the case by fraudulent documents. By his false denials on the stand he sought to further the proof by fraud. His fraud, that of the plaintiff's president, chief executive officer and substantially the sole owner of the corporate stock, is of course imputed to the plaintiff corporation. *Wagner Iron Works v. United States*, 174 F.Supp. 956, 958, 146 Ct.Cl. 334, 338 (1959).

The evidence is thus clear and convincing, as required for a forfeiture under section 2514, that fraud was practiced, and that it was corruptly practiced. The fraud was practiced with a deliberate, knowing intent to deceive the court into making a decision favorable to the plaintiff, namely that plaintiff's profits were less than they actually were, and less excessive than the Renegotiation Board had determined. *Law v. United States*, 195 Ct.Cl. 370, 440–41 (1971); *Little v. United States*, 152 F.Supp. 84, 87, 138 Ct.Cl. 773, 778 (1957) (contract for services over a period of years held forfeited for fraud in the earlier years in connection with services not the subject of suit); *Kamen Soap Products Co. v. United States*, 124 F.Supp. 608, 620, 129 Ct.Cl. 619, 641–42 (1954) (fraud in the prior administrative proceeding held to cause forfeiture of suit in this court); *Wagner Iron Works v. United States, supra* (forfeiture for fraud consisting of false vouchers in a termination claim); *cf. Kamen Soap Products Co. v. McElroy*, 103 U.S.App.D.C. 203, 257 F.2d 207, 208 (1958); *Globe Indemnity Co. v.*

*United States*, 84 Ct.Cl. 587, 592–94, *cert. denied*, 302 U.S. 707, 58 S.Ct. 26, 82 L.Ed. 546 (1937).

B. The Renegotiation Proceeding Under 50 U.S.C.App. § 1218 as a Claim Subject to Forfeiture under 28 U.S.C. § 2514

The next question, one of law, is whether the instant proceeding, a judicial proceeding for the redetermination of the excessiveness of profits under section 108 of the Renegotiation Act, 50 U.S.C.App. § 1218 (1970 & Supp. V 1975), is a "claim against the United States" within the meaning of 28 U.S.C. § 2514 (note 1, *supra* ).

Plaintiff contends that claims against the United States under section 2514 may include claims only for money, whereas this proceeding under the Renegotiation Act is a claim for a declaration that no excessive profits were realized in the year in question and, if anything, it is a claim for money by the United States and not by the plaintiff.

The contention raises issues as to whether the present proceeding is a claim for money and, if not, whether only a claim for money or property may be a "claim against the United States" within section 2514. The final issue is the breadth of the category of "claims" within the reach of section 2514.

1. *To What Extent is the Judicial Renegotiation Proceeding a Claim by the Plaintiff for Money or Property?* The following passage in the opinion in *Lykes Bros. S.S. Co. v. United States, supra*, 459 F.2d at 1400, 198 Ct.Cl. at 325, is plaintiff's authority for the proposition that the proceeding under the Renegotiation Act for a redetermination of excessive profits as determined by the Renegotiation Board, is an action by the plaintiff for a declaratory judgment and by the Government for money:

> In fact, a renegotiation case is unlike any other case filed in this court, because the plaintiff here is not seeking to recover a money judgment against the United States. It is the Government, based upon a unilateral order of the Renegotiation Board, which asserts that the contractor owes it money. If the contractor wholly

prevails, the court will enter a declaratory judgment that no excessive profits were realized during the year involved.

These words were written in the course of a decision that the burden of proof of excessiveness rested on the Government, which must prove its contention that the contractor realized excessive profits. The description of the suit as one in which the Government asserts that the plaintiff owes it money was thus made in a context of an inquiry to divide and allot between the parties the burden of proof on the underlying issues. The quoted passage, while it characterizes elements of the proof to be made in the suit, is not a definitive characterization of the totality of the action as a "claim" or not, and certainly not as a claim under 28 U.S.C. § 2514. Indeed, another characterization of the proceeding, in the same opinion, points the other way from plaintiff's conclusion from the quoted passage. The court also said, referring to the similarity of actions for declaratory judgments and suits in this court to redetermine excessive profits, that "perhaps the best analogy involves those cases before the boards of contract appeals in which a contractor appeals from a contracting officer's assessment of extra costs." In such a case, the court continued, "the contractor has a right to a de novo hearing", and "[h]ere, as in those cases, the Government claims that the contractor owes it money." *Lykes Bros. S.S. Co. v. United States, supra*, 459 F.2d at 1402–03, 198 Ct.Cl. at 329–30. Yet in these same contract appeals, the boards of contract appeals have held the contractors' appeals to be "claims against the United States" within the meaning of regulations denying cost reimbursement to contractors of the expenses of "claims against the United States." *Reed & Prince Mfg. Co.*, ASBCA No. 3172, 59–1 BCA ¶ 2172 (1959). The characterization of one proceeding by analogy to another is valid only in the context in which it is made.

*Lykes Bros. S.S. Co.*, therefore, does not settle whether the characteristics of the judicial renegotiation suit, in terms of money passing are such as to make the suit one

for money under a rule which may define "a claim against the United States" as a demand for money. It was not relevant in that case, for instance, to explore the monetary consequences of the judgment sought by the plaintiff. That subject begins with the order of the Renegotiation Board determining the amount of a contractor's excessive profits for a given year.

The Renegotiation Act provides that the Renegotiation Board is authorized to reach agreement with the contractor subject to renegotiation, and if agreement cannot be reached, the Board may under section 105(a) of the Act issue an order, without due process standards, determining the amount of the contractor's excessive profits in the year under review, 50 U.S.C.App. §§ 1215(a) and (b)(3) (1970 & Supp. V 1975). The amount so determined, with a credit for taxes paid on the amount of profits which are determined to be excessive, may be collected by the Government by withholding of sums due either to the contractor or to other Government contractors who are indebted to the contractor. 50 U.S.C.App. §§ 1215(b)(1), (b)(3), (b)(8) (1970 & Supp. V 1975).

The contractor may of course pay and seek no further relief, in which case the present question does not arise. Should he be aggrieved by an order of the Board, however, he may under section 108 of the Act (50 U.S.C.App. § 1218) file a petition with this court—such as the present action—for a redetermination of the amount of excessive profits.[2] The suit is to be heard and determined de novo, not as a proceeding to review the determination of the Board. The petition was prior to 1972 filed in the Tax Court; at that time jurisdiction was transferred to this Court. Act of July 1, 1971, Pub.L. No. 92–41, 85 Stat. 97, 50 U.S.C.App. § 1218 (Supp. V 1975).

If the contractor does not pay the amount ordered by the Board, and brings the proceeding for redetermination with which we are now concerned, the filing of the petition in this court acts as a stay of execution of the order of the Board if, but only if, within 10 days of the filing of the petition, the plaintiff files with the court a bond in the amount determined by the court. 50 U.S.C. App. § 1218 (Supp. V 1975). The court has provided in Rule 26 that the amount of the bond shall be 100 percent of the Board decision less applicable tax credits. Absent such a stay of execution, the Government will ordinarily be entitled to judgment on its customary counterclaim for the amount determined by the Board. In one case the court held that a contractor in bankruptcy might on prescribed proofs press his suit without filing a bond, in the interest of preserving his constitutional right to challenge the unilateral determination of the Board. *Sandnes' Sons, Inc. v. United States*, 462 F.2d 1388, 199 Ct.Cl. 107 (1972). The instant petitioner applied for the same privilege, on the ground of financial hardship. It was denied relief, the Government was granted judgment on its counterclaim for $157,432.55, the amount ordered by the Board less applicable taxes, and the petitioner has satisfied the judgment. *O'Brien Gear & Machine Co. v. United States*, 199 Ct.Cl. 1014 (1972). By and large, therefore, it may be said that substantially every petitioner who seeks a redetermination of ex-

---

2. Section 113 of the Renegotiation Act, as amended, 50 U.S.C.App. § 1223 (1970), regulates the prosecution of "claims against the United States," but its presence in the Renegotiation Act is not a characterization of the proceeding for the redetermination of profits as a claim against the United States, and is without significance for the present case. Its purpose, from its first enactment in 1942, has been to lighten the burdens of the conflict-of-interest laws on the lawyers, accountants and others who might serve in the agencies engaged in defense procurement and thereafter be employed in the prosecution of claims against the United States unrelated to their employment. *See* Hearings Before the Senate Committee on Finance on § 403 of Pub.L.No. 528, 77th Cong., 2d Sess. 44, 45 (1942); 40 Op.Att'y Gen. 294, 298–99 (1943); S.Rep.No.92, 82d Cong., 1st Sess. 12, 21 (1951); U.S.Code Cong. & Admin. Serv. 1951, p. 1339; 97 Cong.Rec. 1331 (1951); S.Rep.No. 2624, 84th Cong., 2d Sess. 14–15 (1956); H.R.Rep.No. 2549, 84th Cong., 2d Sess. 13, 25 -26 (1956); U.S.Code Cong. & Admin. News 1956, p. 3823; R. Davis, *The Federal Conflict of Interest Laws*, 54 Colum.L.Rev. 893, 912 n.88 (1954).

cessive profits has or will be required either to pay the amount ordered by the Board before or during the pendency of his suit for redetermination, or to give security in the form of a bond for the amount. *Solitron Devices, Inc. v. United States*, 537 F.2d 417, 210 Ct.Cl. 352 (1976), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1548, 51 L.Ed.2d 773 (1977).

If the contractor who has paid prevails in his suit for a redetermination, he will obtain a judgment determining in what amount, less than that determined by the Board, excessive profits were realized. No judgment is given in this court for the difference between the amounts determined by the Board and by this court; the court is limited to a determination that no excessive profits were realized or that excessive profits were realized in a stated amount less than that determined by the Board. But section 108 of the Act itself provides that the successful contractor is to receive a refund following a determination in his favor: "Any amount collected by the United States under an order of the Board in excess of the amount found to be due under a determination of excessive profits by the Court of Claims shall be refunded to the contractor or subcontractor with interest . . . ." 50 U.S.C.App. § 1218 (1970 & Supp. V 1975). And so the court's conclusion of law in a case in which a contractor has been successful in part, has contained all of the following: a determination that the plaintiff realized excessive profits in a stated amount (less than that determined by the Board and paid by the plaintiff), a judgment for that amount in favor of the

Government, on its customary counterclaim, and an order that "plaintiff is entitled to a refund" of the difference between the amount paid by it and the amount of the judgment on the counterclaim. *See Major Coat Co. v. United States*, 543 F.2d 97, 124, 211 Ct.Cl. 1, 48–49 (1976).[3] The last provision—that plaintiff is "entitled" to a refund—states the inevitable, whether or not it appears in the opinion of the court, once the contractor is successful to any degree.[4] The contractor who has filed a bond and who prevails obtains a release of his bond— an entire release if the decision is that his profits were not at all excessive, or a release conditioned on his payment of the amount determined.

Money or its equivalent, a bond for the payment of money, thus passes from the plaintiff to the Government in every suit for redetermination of profits and from the Government to the plaintiff as a consequence of every successful suit. The suit is thus in reality one for the release of the bond, if one was given, or the refund of the money paid over to the Government. Payment back of the money, if money was paid, will follow directly upon success in the suit. Entitlement having been determined by the court, the contractor who prevails obtains a refund, pursuant to the mandate of section 108 of the Act, quoted above, for a refund of any amount collected by the Government in excess of the amount found by the court to be excessive. The action, which in terms of burdens of proof may be one in which the Government asserts that plaintiff owes it money and which in form is an action by plaintiff for a declaratory judgment as to

---

**3.** The conclusion of law in the opinion in this case, cited in the text, reads as follows:

"Upon the findings of fact which are made a part of the judgment herein, and for the reasons given in the opinion, the court concludes as a matter of law that for the fiscal year ended January 31, 1968, plaintiff and Major Clothing Co., as a consolidated group, realized excessive profits in the gross amount of $560,000 from contracts and subcontracts subject to renegotiation under the Renegotiation Act of 1951, as amended. Judgment is hereby entered on defendant's counterclaim in the sum of five hundred sixty thousand dollars ($560,000) less appropriate state and federal tax credits, plus

interest thereon as provided by law, and it is ordered that plaintiff is entitled to a refund of the amount paid to defendant in excess of the judgment entered on the counterclaim, together with interest as provided by law."

**4.** Such a statement did not appear in the opinion in *Mason & Hanger-Silas Mason Co. v. United States*, 518 F.2d 1341, 207 Ct.Cl. 106 (1975); *A. C. Ball Co. v. United States*, 531 F.2d 993, 997, 1018, 209 Ct.Cl. 223, 230–31, 267 (1976). It did appear in *Aero Spacelines, Inc. v. United States*, 530 F.2d 324, 367, 208 Ct.Cl. 704, 776 (1976) and *Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 211 Ct.Cl. 110, 144 (1976).

excessiveness of profits, is thus also seen to be an action in which the plaintiff is seeking either a return of money paid over to the Government as a condition of bringing suit, or the release of the bond given as security for the payment of the money.

The next question is whether the action, understood as set out in the foregoing, is sufficiently an action for money to come within the rule, if such a rule there be, that "claims" against the United States generally refer only to claims for money and property.

■ 2. *May "Claims" Against the United States be Claims For Money or Property Only?* An application for a passport or an antitrust clearance letter, a suit for a mandatory transfer of public land, a declaratory judgment as to the applicability of a registration act or a money judgment for a commercial debt—all might reasonably be described as claims against the United States. The "claim against the United States" to which consequences are ascribed in a statute,[5] is a claim for only money or property when, and only when, the statutory context and purpose so require.

In *United States v. Cohn*, 270 U.S. 339, 345–46, 46 S.Ct. 251, 70 L.Ed. 616 (1926), the court held a false claim for the release from customs of non-dutiable goods in the hands of the United States as bailee not to be a "claim" against the Government in violation of the False Claims Act, now 31 U.S.C. §§ 231–235 (1970). The purpose of the statute was held determinative that the demand, though one for property, was not a claim against the United States. The decision recognized that while the word "claim" may sometimes be used in the broad juridical sense of a demand as of right upon another to act as a matter of duty, "it is clear, in the light of the entire context, that in the present statute" the "claim upon or against" the United States related "solely to the payment or approval of a claim for

money or property to which a right is asserted against the Government, based upon the Government's own liability to the claimant." 270 U.S. at 345–46, 46 S.Ct. at 253. Again, in *United States v. Bergson*, 119 F.Supp. 459 (D.D.C.1954), the "claim" against the Government in a conflict-of-interest law, former 18 U.S.C. § 284, was held not to include an application for an antitrust clearance letter, but to be limited to claims for money or property only.

The "claim" under the False Claims Act has been the frequent subject of judicial decision. In *United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958), it was held that a claim against the Government "normally" connotes a demand for money or a transfer of public property, and does not for purposes of the False Claims Act include an application for credit insurance by the Federal Housing Administration. Such an application "does not fairly come within the scope that Congress intended the Act to have." 356 U.S. at 599, 78 S.Ct. at 953. The provisions of such a criminal statute, the court said, "must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions." 356 U.S. at 598, 78 S.Ct. at 952.

A companion case to *McNinch, Rainwater v. United States*, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958), involved false applications for crop loans to the Commodity Credit Corporation. These the court held to be "claims" against the Government in violation of the False Claims Act. The difference between the two cases, both involving the same statute, would seem to be the immediacy of the false demand with the consequent acquisition of public money. The Commodity Credit Corporation would make a loan directly upon approval of the

---

**5.** Illustrations of statutes regulating claims against the United States are the False Claims Act, 31 U.S.C. §§ 231–235; the Anti-Assignment of Claims Act, 31 U.S.C. § 203; the various conflict of interest laws in chapter 11 of Title 18; the Court of Claims Acts, i. e., 28 U.S.C. § 1491 and chapters 91 and 165 of Title 28; the Federal Tort Claims Act, 28 U.S.C. § 1346 and chapter 85 of Title 28; and the Administrative Procedure Act, 5 U.S.C. § 702, as amended by Pub.L.No. 94–574, 90 Stat. 2721.

false application. The FHA's decision to insure a loan, however, the court said in *McNinch*, "disburses no funds nor does it otherwise suffer immediate financial detriment. It simply contracts, for a premium, to reimburse the lending institution in the event of future default, if any." 356 U.S. at 599, 78 S.Ct. at 952.

The tie between the claim and the money sought was again canvassed in *United States v. Neifert-White Co.*, 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) where the charge of violation of the False Claims Act was based on a false invoice for a grain storage bin, given to the bin dealer's customer for submission to the Commodity Credit Corporation in support of a loan application. The invoice was intended fraudulently to induce the Commodity Credit Corporation to extend a loan to the customer in excess of the maximum lawful percentage of the actual purchase price. The Supreme Court now held that the False Claims Act was "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government"; former opinions were described as having "consistently refused to accept a rigid, restrictive reading" of the Act, even in connection with the imposition of criminal sanctions. The false invoice was held a claim because it was a "statement made with the purpose and effect of inducing the Government immediately to part with money." "This remedial statute reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." 390 U.S. at 232–33, 88 S.Ct. at 961–962.

These cases, taken together, show that the permissible chain of causation between the false statement and its success may thus lengthen, depending on the purpose of the statute to reach the falsity presented. In *Neifert-White* the bin dealer passed a false invoice to his customer, who attached it to his loan application to the Commodity Credit Corporation. In *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed.2d 443 (1943), the chain was much longer. There the False Claims Act was held to apply to contractors who presented collusive bids on public projects to the local officers of a Pennsylvania county, received awards of contracts from those authorities, and ultimately obtained payment under the contracts in the form of a check drawn by the county authorities on an account containing both federal and local funds.

A "claim" may be found to exist, if the statutory purpose requires it, even when money is not its object. This was recently illustrated by the decision in *Grumman Aerospace Corp.*, NASA BCA Nos. 823–11, 1073–15, 76–1 BCA ¶ 11,763 (1976)[6] that a contractor's attorneys fees in a proceeding to redetermine profits under the Renegotiation Act (the very kind of case such as the one at bar) are a non-allowable cost to a cost-reimbursable contractor under the prohibition in the NASA procurement regulations, 41 C.F.R. § 18–15.205–31(d), of the reimbursement of the costs of "prosecution of claims against the Government." Under the same language in the Armed Services Procurement Regulation it has been held that a proceeding for an injunction against the United States is a claim against the United States and its costs are therefore not allowable. *Hayes International Corp.*, ASBCA No. 18,447, 75–1 BCA ¶ 11,076 (1975); *see* ASPR § 15–205.31(d), 32 C.F.R. § 15–205.31(d) (1975).

If the rule is as urged by the plaintiff—that money must be the objective of a "claim" against the United States—the nature of the renegotiation proceeding has been shown, above, to be sufficiently a claim, in the words of the Supreme Court, "with the purpose and effect of inducing the Government immediately to part with money." *United States v. Neifert-White Co., supra*, 390 U.S. at 232, 88 S.Ct. at 961. But the rule which emerges from the deci-

6. The decision is presently the subject of a proceeding in this court and its citation here is not intended as a characterization of the merits of the decision, but only of the underlying principle described in the test. [The decision cited in the text is affirmed in *Grumman Aerospace Corp. v. United States*, 579 F.2d 586, 217 Ct.Cl. —— (1978).]

sions is rather that "claim" is a word of many meanings, to be determined in the context of the purpose of the statute in which it is found. In the False Claims Act, which was remedially aimed at all types of financial frauds on the Government, the "claim" against the Government is held to be conduct which after some intermediate steps has the effect of bringing about a payment of money or other financial loss by the Government. Under other statutes, in the light of their statutory purpose the objective of the claim need not be money. None of the cases on the subject of the scope of "claims" as claims for money or otherwise, however, are cases under section 2514 of the Judicial Code. The precise, determinative inquiry must therefore be focused on section 2514. The answer calls for study of the purpose and intent of the provisions of section 2514 of the Judicial Code for the forfeiture of claims in the Court of Claims sought to be proven by fraud. Does the section reach so far as the renegotiation proceeding now before the court?

3. *The Breadth of the Category of "Claims" Subject to Forfeiture in 28 U.S.C. § 2514.* The source of present-day section 2514 of Title 28 is the Court of Claims Act of March 3, 1863, ch. 92, 12 Stat. 765. This statute transformed the Court of Claims from a body merely advisory to Congress into a court with power to entertain claims, subject to a statute of limitations, hear the Government's counterclaims and enter judgments to be paid out of a general appropriation. *Compare* the Act of February 24, 1855, ch. 122, 10 Stat. 612. Section 11 of the 1863 Act, 12 Stat. at 767, contained what is now codified in 28 U.S.C. § 2514, note 1, *supra.*

■ The Act of March 3, 1863 was passed by the same session of the 37th Congress as enacted the False Claims Act. In the latter Act "the objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made." *Rainwater v. United States, supra,* 356 U.S. at 592, 78 S.Ct. at 948. The 37th Congress was no less determined in the Court of Claims Act to protect the United States from frauds committed in the proof of claims before the newly empowered Court of Claims. The debates on the Court of Claims Act contain repeated references to the frauds which had accompanied the past consideration of claims in the Congress, to the firmness of the Congressional intention to guard against such frauds in the claims in the court and to the purpose of what is now section 2514 as a preventative and a penalty.[7]

■ Congress's purpose to prevent and punish fraud in the Court of Claims was aimed at all who committed fraud and thus at all plaintiffs in the court. No intention can be surmised that some who committed fraud in the proof of their demand would be exempt from the forfeiture provided in section 11 by reason of some narrow definition of the word "claim."

---

7. For example:

"The bill in other respects is well guarded. * * * [I]t is very wisely provided that if there be any fraud practiced, or attempted to be practiced, upon the part of any claimant against this Government in the demand or establishment of his claim, such act of fraud upon his part shall forever forfeit his claim, no matter what it may be." Cong. Globe, 37th Cong., 2d Sess. 1674 (1862).

"To provide further against attempts to practice frauds upon the Government in the proof, statement, establishment, or allowance of any claim, the bill contains a provision that a corrupt attempt to practice such frauds shall work a forfeiture of the particular claim. This is meant to visit with merited punishment that corrupted moral sense which regards the Government as always a proper prey for fraudulent rapacity." Cong. Globe, 37th Cong., 2d Sess. app. 124 (1862).

"I am for protecting the Treasury of the United States. I am for protecting it against unjust claims; and it is because I am for doing that, that I wish to subject every claim to a judicial investigation, that we may not be imposed upon." Cong. Globe, 37th Cong., 3d Sess. 419 (1863).

*See also* Cong. Globe, 37th Cong., 3d Sess. 303–13, 393, 398–99, 401, 413, 417–18, 420 (1863); H.R.Rep.No.34, 37th Cong., 2d Sess. 3 (1862).

The words of section 11 reflect the intention to equate claims with all suits and to equate the persons subject to forfeiture with all plaintiffs who committed fraud (12 Stat. at 767):

Sec. 11. And be it further enacted, That any person or persons who shall corruptly practise or attempt to practise any fraud against the United States in the proof, statement, establishment, or allowance of any claim, or any part of any claim against the United States, shall ipso facto forfeit the same to the Government; and it shall be the duty of the court of claims, in such cases, to find specifically that such fraud was practised or attempted to be practised, and thereupon give judgment that such claim is forfeited to the Government, and that the claimant be forever barred from prosecuting the same. Appeals may be taken from the court of claims to the supreme court, in all such cases, on all questions of law, in the manner herein provided for appeals in other cases.

The breadth of the application of the section is repeatedly seen in the forcible quality of the phrases used. The forfeiture is to apply to "any person or persons" who practice or "attempt" to practice "any" fraud, whether in the "proof, statement, establishment, or allowance" of "any claim, or any part of any claim." The forfeiture is to take place "ipso facto" on the practicing or the attempt. Judgment as to practicing or attempting to practice fraud shall be given and shall provide "that the claimant be forever barred from prosecuting the same."

Over the years the codifiers have reduced the original energetic language to the two concise sentences which now compose section 2514:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

In such cases the Court of Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

"Changes," the codifiers well say, "were made in phraseology." One change was the omission of the forfeiture of "any part of any claim." Another was the omission of the "ipso facto" nature of the forfeiture, perhaps an unrealistic expectation in view of the provision for a judgment of forfeiture. Still another was the loss of the prescription that "the claimant be forever barred from prosecuting" the forfeited claim.

More relevant for the present inquiry was the change in the orientation of the section, from a penalty on persons to a penalty on claims. Whereas section 11 was directed at "any person or persons" who engaged in the forbidden conduct, the passive language of section 2514 reads that a "claim" "shall be forfeited * * * by any person" who practices the forbidden conduct. In the statute as enacted in 1863, moreover, the "person," the "claimant" and the party plaintiff were all equivalents. The "person" practicing fraud was undoubtedly the possessor of the claim, that is, the plaintiff. The clause barring him from further prosecution called him the "claimant." This original stress on the person who committed the fraud signified the intention that all persons, without qualification, and thus that all plaintiffs should be subject, on their commission of fraud, to the penalty of forfeiture of their claim.

The section immediately preceding section 11, providing for a 6-year statute of limitations, began with the words "[t]hat every claim against the United States, cognizable by the court of claims, shall be forever barred unless * * *." 12 Stat. at 767. And so its present-day successor, section 2501 of Title 28, provides that "[e]very claim of which the Court of Claims has jurisdiction shall be barred * * *." Who can doubt that had the framers of section 11 in 1863 cared to write so as to impose the forfeiture on "claims" instead of "persons," they would have opened the section with the words "every claim," as they had in the section preceding? Fraudulent claims were at least as much disapproved as stale claims.

No distinction among petitioners or claims was intended or even intimated. All those who made claims in the Court of Claims were to be subject to section 11, not only a limited class who had money claims. True, in the years to come the Supreme Court would hold that the statute as enacted in 1863 committed to the Court of Claims jurisdiction of claims for money only and excluded claims for property, decrees of specific performance or declaratory judgments. *United States v. Jones*, 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1899); *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *cf. United States v. Alire*, 73 U.S. (6 Wall.) 573, 18 L.Ed. 947 (1868); *Bonner v. United States*, 76 U.S. (9 Wall.) 156, 19 L.Ed. 666 (1870). But the bill which became the Act of March 3, 1863 as first enacted by the House conferred on the Court of Claims jurisdiction of all claims for which the Government would be liable in law or in equity, if it were suable in a court of justice. Cong. Globe, 37 Cong., 2d Sess. app. 124 (1862). Only in the Senate was the bill amended to read as it did on enactment, giving little new jurisdiction to the court over the original jurisdiction in the 1855 bill. Cong. Globe, 37th Cong., 3rd Sess. 306 (1863); Act of March 3, 1863, ch. 92, § 3, 12 Stat. 765; *cf.* Act of February 24, 1855, ch. 122, § 1, 10 Stat. 612.

The conclusion to be drawn from the legislative history of section 2514, therefore, is that Congress intended by it that every suit brought in the Court of Claims should be subject to the forfeiture provided, on the commission of the specified fraud. This court has faithfully so applied the section. In no case has the court held section 2514 or its predecessors inapplicable because of the type of claim made, once proof of the requisite fraud was shown. *See, e. g., Jerman v. United States*, 96 Ct.Cl. 540 (1942) (contract for sale of goods); *Furay v. United States*, 34 Ct.Cl. 171 (1899) (officer's suit for accounting); *Standard Oil Co. v. United States*, 47 F.Supp. 120, 98 Ct.Cl. 201 (1942), *cert. denied*, 319 U.S. 749, 63 S.Ct. 1156, 87 L.Ed. 1704 (1943) (income tax refund); *Erie Basin Metal Products, Inc. v. United States*, 150 F.Supp. 561, 138 Ct.Cl. 67 (1957) (suit under Contract Settlement Act).

In *Jerman v. United States, supra*, the plaintiff had delivered hay accompanied by an invoice fraudulent as to the quality of the hay. The court adjudged a forfeiture under the predecessor of section 2514, rejecting the defense that a fraudulent invoice was not a "claim" under the statute. The right to sue under the jurisdictional act, the court held, was the claim.

*Furay v. United States, supra*, was a suit by a Government officer for an accounting under the predecessor of present 28 U.S.C. § 1494, a form of jurisdiction first entrusted to the Court of Claims by the Tucker Act of March 3, 1887, ch. 359, § 3, 24 Stat. 505. Without hesitation the court applied the forfeiture provision, enacted in 1863, to the officer's suit for an accounting of which jurisdiction was acquired in 1887.

In the light of the close similarity between the instant renegotiation action and the action for an accounting by an officer, *Furay* is direct authority for the applicability of the forfeiture provision of 1863 to the renegotiation proceeding entrusted to the court in 1971, in the Act of July 1, 1971, Pub.L. No. 92–41, §§ 3–4, 85 Stat. 97, 50 U.S.C.App. § 1218 (Supp. V 1975).[8]

The Tucker Act had provided for a suit by an officer to settle his account in which the court was to "proceed to hear the parties and to ascertain the amount, if any, due to the United States on said account." Payment by the petitioner should "discharge such obligation," and "[a]n action shall accrue to the United States against such principal, or surety, or representative to recover the amount so found due," which action might be brought within 3 years and

---

**8.** The legislative history of the transfer from the Tax Court to the Court of Claims of jurisdiction over the renegotiation proceeding, moreover, suggests a Congressional desire to commit the renegotiation proceeding to all the incidents of the jurisdiction of the Court of Claims. H.R.Rep.No.92–235, 92d Cong., 1st Sess. 6 (1971); S.Rep.No.92–245, 92d Cong., 1st Sess. 7 (1971), U.S.Code Cong. & Admin. News 1971, p. 1130. *See Lykes Bros. S.S. Co. v. United States*, 459 F.2d 1393, 1398, 198 Ct.Cl. 312, 322 (1972).

if not brought would be barred. Act of Mar. 3, 1887, 24 Stat. at 506.

Here, then, was an action for a declaratory judgment as to how much money, if any, was due the United States. In such a suit, the petitioner would doubtless contend that no or little money was due to the Government, and the Government would assert that the plaintiff owed it a larger sum. The court was not to enter judgment for the amount determined to be due.[9] Once the amount was determined, and if the petitioner did not pay, the Government could sue the officer for the sum involved. This description of the officer's accounting suit is substantially the same as the characterization of the judicial renegotiation proceeding in *Lykes Bros. S.S. Co. v. United States, supra,* on which plaintiff relies so heavily. Both actions were added to the jurisdiction of the Court of Claims long after the enactment of the forfeiture statute. Both, equally, are claims against the United States subject to forfeiture under section 2514.

The contention that the renegotiation proceeding is not a claim against the United States within the meaning of 28 U.S.C. § 2514 is rejected, and fraud having been found to be practiced in the proof of the claim, the claim is forfeited, and the petition is dismissed.

## II

### The Failure of Proof of a Prima Facie Case

 The Government's further defense, beyond the plea of forfeiture for fraud, is that the claim should be dismissed for failure to make the prima facie case required of the plaintiff. Reliance for this defense is placed on the same data as is said to support the first defense—the showing as to the unreliable and fraudulent nature of the proof presented by plaintiff in support of its case.

This defense, too, is sustained.

The financial data submitted by plaintiff, already described, is held insufficient to meet plaintiff's burden of showing what were its sales, costs and profits. Plaintiff's ledgers and journals are so lacking in substantiation, so shown to have been false and fraudulent in matters of payments, invoices, checks and other disbursements as to require their rejection as wholly untrustworthy. In addition to the frauds in these books affirmatively demonstrated, there is plaintiff's conviction for removing and destroying its records, when they were subpoenaed by a grand jury. The possibility of further unknown frauds is great. All in all, plaintiff's books and records are deprived of all trustworthiness and thus of any probative value. In a word, plaintiff has legally speaking failed to prove any of its sales, costs and profits. Accordingly, it has failed to meet the burden imposed on it of making a prima facie case in this proceeding, a major element of which is a showing of its costs and profits. *Lykes Bros. S.S. Co. v. United States, supra,* 459 F.2d at 1401, 198 Ct.Cl. at 326–27.

It is only the ultimate burden which under *Lykes Bros. S.S. Co.* rests on the Government. The plaintiff must under that decision file suit and bear the first burden of proof as to its profits and costs and also "the initial burden of going forward with proof as to the statutory factors upon which it relies," to the extent it has knowledge of these matters, to show nonexcessiveness of its profits. When the plaintiff fails to make out its prima facie case, the ultimate burden does not shift to the Government and plaintiff's action is dismissed. *Lykes Bros. S.S. Co. v. United States, supra; cf. Aero Spacelines, Inc. v. United States,* 530 F.2d 324, 332–33, 208 Ct.Cl. 704, 716–17 (1976).

The proof as to plaintiff's entitlement to consideration under the statutory factors of

---

**9.** The power in the Court of Claims to enter judgment on the amount determined to be due to the United States was added only in 1953 by the Act of July 28, 1953, ch. 253, § 9, 67 Stat. 226, 28 U.S.C. § 1494 (1970). At the same time, the action was converted from one to determine the amount "due the United States" to one to determine the amount "due to or from" the United States.

50 U.S.C.App. § 1213(e) is in the same state as its proof of profits and costs. Plaintiff's books and the testimony of its president, the only evidence on the subject of plaintiff's entitlement to consideration under the statutory factors, have been found to be unworthy of any credence. It follows that plaintiff has failed utterly to show that it is entitled to favorable consideration on any inquiry into the excessiveness of its profits. Some letters from Naval officers that plaintiff performed "a job well done" in the delivery of "vital electronic repair parts" are dismissed as far outweighed by the conclusive showing that plaintiff regularly supplied substandard goods, with knowledge of their failure to meet specifications. Plaintiff thus failed, too, to meet the burden of proof, to the extent even of information available to it, of showing that it is entitled to favorable consideration under 50 U.S.C. App. § 1213(e). The foregoing conclusions as to the state of plaintiff's proof—both of its costs and profits and the statutory factors—are an alternative ground for the dismissal of the petition.

Finally, it may be noted that were the issue presented for decision, the evidence in the record of plaintiff's deliberate, gross and fraudulent deviations from the specifications in numbers of Government defense contracts would go far to deprive plaintiff of a favorable consideration in any determination as to the excessiveness of its profits. Plaintiff's contribution to national defense was negative. It supplied defective parts for a range of weapons of war—machine guns, aircraft, guided missiles and tanks. The supply of defective parts for the operation of weapons in time of war is a direct and serious harm to national defense. *United States v. United States Cartridge Co.*, 95 F.Supp. 384 (E.D.Mo.1950), aff'd 198 F.2d 456 (8th Cir. 1952), *cert. denied,* 345 U.S. 910, 73 S.Ct. 645, 97 L.Ed. 1345 (1953). Such evidence would raise questions, too, under the Renegotiation Act's factors of efficiency, reasonableness of costs and profits, contribution to the national defense, the public interest and fair dealing. 50 U.S.C. App. § 1213(e). These questions need not, however, be determined, in view of the

judgment of forfeiture and the Government's waiver, on such a judgment, of any claim for a determination of excessiveness in an amount greater than that made by the Board.

In conclusion, it is held that plaintiff's attempted proof of its claim was pervaded by fraud, corruptly practiced, and that the claim is accordingly adjudged to be forfeited under 28 U.S.C. § 2514. Judgment of forfeiture is entered on defendant's counterclaim and the petition is dismissed.

## CONCLUSION OF LAW

The claim of the plaintiff is adjudged forfeited pursuant to 28 U.S.C. § 2514. The petition is dismissed and judgment of forfeiture is entered on defendant's second counterclaim.